IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

GLENN CONSTRUCTION COMPANY, )
LLC, )
                            )
        Plaintiff, )
v. )      CASE NO. 1:09-cv-250-MEF
                            )
BELL AEROSPACE SERVICES, INC., )
*et al.*, )     (WO – PUBLISH)
                            )
        Defendants. )

## MEMORANDUM OPINION AND ORDER

This action arises out of the construction of a helicopter hangar at Defendant Bell

Aerospace Services, Inc.'s ("Bell Aero") facilities in Ozark, Alabama ("the Project").

Bell Aero was the owner of the Project and Defendant Barge, Waggoner, Summer &

Cannon, Inc. ("BWSC") was the project engineer (collectively, "Defendants").  Plaintiff

Glenn Construction Company, LLC ("Glenn Construction") was hired as the general

contractor for the Project on February 2, 2007.  Mike Wolfe ("Wolfe") is the co-owner

and president of Glenn Construction.  Glenn Construction brings claims for breach of

contract,[1] negligence, wantonness, fraud, and intentional interference with contractual

---

[1]  This claim is brought solely against Bell Aero.  In its response to the motions for
summary judgment, Glenn Construction admits that there is no contract between itself and
BWSC.  Furthermore, in the final pre-trial conference held on May 6, 2011, Glenn Construction
clarified that the breach-of-contract claim was *only* against Bell Aero.  As discussed further
below, the parties dispute whether the tort claims were brought against both Defendants or only
BWSC.

relations.[2]  This cause is now before the Court on seven motions.  Three are motions for summary judgment: (1) Bell Aero's first motion for summary judgment, (Doc. # 32), filed on November 9, 2010; (2) Bell Aero's alternative motion for summary judgment, (Doc. # 54), filed on January 14, 2011; and (3) BWSC's motion for summary judgment, (Doc. # 49), filed on January 14, 2011.  Glenn Construction has filed two additional motions: a motion to strike two affidavits by BWSC's non-retained experts, (Doc. # 80), filed on February 28, 2011 and a motion to supplement its evidentiary submissions, (Doc. # 78), filed on February 16, 2011.  On February 28, 2011, BWSC opposed the motion to supplement and moved to strike it.  (Doc. # 82).  Finally, BWSC filed a motion to strike the affidavit of Mac Brittingham ("Brittingham")—Glenn Construction's previously undisclosed retained expert witness—on February 14, 2011.  (Doc. # 75).

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over the case pursuant to 28 U.S.C. § 1332 (diversity).[3]  Venue is proper in this district pursuant to § 1391(a)(2).  The parties do

---

[2]  On December 21, 2009, upon consideration of Bell Aero's Motion to Dismiss, (Doc. # 7), filed on April 23, 2009, this Court dismissed Counts 4 and 5 for work on an open account and for work and labor done.  (Doc. # 18).

[3]  As a limited liability company, Glenn Construction is a citizen of all states in which its members are citizens.  *See Rolling Greens MHP, L.P. v. Comcast SCH Holdings L.L.C.*, 374 F.3d 1020, 1021–22 (11th Cir. 2004).  Glenn Construction is made up of two members, Mike Wolfe ("Wolfe") and Janet Wolfe, both of whom are citizens of Alabama. Thus, Glenn Construction is a citizen of Alabama.  Bell Aero is a citizen of Delaware, its state of incorporation, and Texas, where its principal place of business is located.  BWSC is a citizen of Tennessee, which is both its state of incorporation and the location of its principal place of business.

not dispute personal jurisdiction.

## FACTS AND PROCEDURAL HISTORY

I.      **Facts**

This action arises out of a $6,000,000 contract ("the Contract") between Glenn Construction and Bell Aero for the construction of the helicopter hangar at Bell Aero's facilities in Ozark, Alabama.

A.      **The Formation of the Contract and Relevant Provisions**

In 2005, Bell Aero contacted BWSC regarding the Project and began preparing for the bidding process.  Bell Aero selected BWSC to serve as the engineer on the Project. According to Bell Aero, prior to submission of its bid, Glenn Construction had a complete copy of the Project Manual.  (Doc. # 55, at 2 (citing Doc. # 56 Ex. 2, Wolfe Dep. 92:11–17)).  The Instruction to Bidders section of the Project Manual permitted bidders to "access the site to conduct such investigations and tests as each [b]idder deems necessary for submission of his bid with prior approval of OWNER or ENGINEER."  (Doc. # 57 Ex. 41).  Glenn Construction did not do any such investigations or tests prior to bidding on the Project.  (Doc. # 56 Ex. B, Wolfe Dep. 95:11–96:23).  The Instruction to Bidders section also stated that "[t]he submission of a bid will constitute an incontrovertible representation by the Bidder . . . that the Contract Documents are sufficient in scope and detail to indicate and convey understanding of all terms and conditions for performance of the work."  (Doc. # 57 Ex. 41).

3

On January 4, 2007, Glenn Construction submitted its bid for the Project.  (Doc. # 66 Ex. 12).  On February 2, 2007, Bell Aero awarded the $ 6,000,000 Contract for the Project to Glenn Construction and a notice to proceed was prepared that same day.  (Doc. # 66 Ex. 13).  Glenn Construction received the notice to proceed and began work on February 7, 2007.  (Doc. # 66 Ex. 14).  Pursuant to the notice to proceed, Glenn Construction was to complete the Project within 226 days making September 21, 2007 the date of completion.  (Doc. # 57 Ex. 4).  Additionally, the Contract contained General Conditions, drawings, and Specifications, which were also found in the Project Manual.

### i.    BWSC's Responsibilities as Engineer

The Contract described the engineer as the owner's "representative" on the Project, (Doc. # 57 Ex. 1, General Conditions § 9.01), and the owner was to communicate with the contractor through the engineer.  (*Id.* § 8.01).  Under the Contract, the engineer had several responsibilities related to supervising the Project and rendering impartial, binding decisions on various matters.  For example, the engineer was to make site visits at "intervals appropriate to the various stages of construction as [it] deems necessary,"  (*Id.* § 9.02(A)).  The engineer's responsibilities also included issuing, "with reasonable promptness," written clarifications or interpretations of the requirements of the Contract as it "may determine necessary."  (*Id.* § 9.04).  Such decisions were binding on both the owner and the contractor.  (*Id.*).  The engineer was also permitted to "authorize minor variations" in the Project and such decisions were again binding on both the owner and

the contractor.  (*Id.* § 9.05).  The engineer could recommend change orders[4] which the parties "shall execute."  (*Id.* § 10.03).  Furthermore, the engineer was to act as an impartial "interpreter and judge" on disputes—referred to as "claims" under the Contract—about the Contract's price or time limits.  (*Id.* § 9.09(B)).  Its decisions on such claims were "final and binding upon OWNER and CONTRACTOR" unless the decision was appealed or a party provided written notice within thirty days and filed suit within sixty days.  (*Id.* § 10.05(B)).  Finally, the engineer was also responsible for reviewing applications for payment and either "indicat[ing] in writing a recommendation of payment and present[ing] the application to OWNER or return[ing] the [a]pplication to CONTRACTOR indicating in writing" why the application was rejected.  (§ 14.02(B)(2)).

### ii.    Provisions for Making Changes to the Project

Section 3.04 explains that "the Contract documents may be amended to provide for additions, deletions and revisions in the Work or to modify the terms and conditions thereof in one or more of the following ways: (i) a Written Amendment; (ii) a Change Order[;] or (iii) a Work Change Directive."  (*Id.* § 3.04(A)).  Engineering or technical

---

[4]  A change order is defined as "[a] document recommended by ENGINEER which is signed by CONTRACTOR and OWNER and authorizes an addition, deletion or revision in the Work or an adjustment in the Contract Price or the Contract Times, issued on or after the Effective Date of the Agreement."  (Doc. # 57 Ex. 1, General Conditions § 1.01(9)).

changes are to be made by a change order or a work change directive.[5]  (*Id.* §§ 1.01(9),

1.01(49)).  However, § 9.5 states that the engineer "may authorize *minor* variations in the

Work from the requirements of the Contract Documents which do not involve an

adjustment in the Contract Price or the Contract Times and are compatible with the design

concept of the completed Project as a functioning whole as indicated by the Contract

Documents."  (*Id.* § 9.05(A) (emphasis added)).  Such minor variations may be made by a

field order, (*id.*), which is defined as "[a] written order issued by ENGINEER which

requires minor changes in the Work but which does not involve a change in the Contract

Price or the Contract Times."  (*Id.* § 1.01(21)).

### iii.    Provisions Regarding Unforeseen Conditions

Furthermore, it was "the intent of the Contract Documents to describe a

functionally complete Project (or part thereof) to be constructed in accordance with the

Contract Documents."  (*Id.* § 3.01(B)).  At the same time, § 4.03 explained what the

---

[5]  A work change directive is defined as follows:

A written statement to CONTRACTOR issued on or after the Effective Date of the
Agreement and signed by OWNER and recommended by ENGINEER ordering an
addition, deletion or revision in the Work, or responding to differing or unforeseen
subsurface conditions under which the Work is to be performed or to emergencies.
A Work Change Directive will not change the Contract Price or the Contract Times
but is evidence that the parties expect that the change ordered or documented by the
Work Change Directive will be incorporated in a subsequently issued Change Order
following negotiations by the parties as to its effect, if any, on the Contract Price or
Contract Times.

(*Id.* § 1.01(49)).

contractor is to do upon discovering a subsurface or physical condition that "is of an unusual nature, and differs materially from conditions ordinarily encountered and generally recognized as inherent in work of the character provided for in the Contract Documents." (*Id.* § 4.03(A)). If the contractor discovered such a condition, it was required to notify the owner and engineer "before further disturbing the subsurface or physical conditions or performing any Work in connection therewith." (*Id.*).

> ***iv.*** **Provisions Regarding Closeout Procedures for Final Payment**

Once the contractor provided notice that the Project was complete, the engineer had to make a final inspection and notify the contractor in writing of all deficiencies. (*Id.* § 14.06). The parties refer to this written notice as a "punch list"—*i.e.* a list of things that the engineer determines needs to be fixed. The contractor was to fix the items on the punch list prior to seeking final payment. Section 14.07 provided that—once the contractor had completed the items on the punch list to the engineer's satisfaction and had provided certain documents—the contractor could apply for final payment.[6] Similarly, the application for final payment must be accompanied by all documentation called for by the Contract Documents, consent of the surety to final payment, and either lien waivers from the subcontractors or an all-bills-paid affidavit from the contractor. (*Id.* §

---

[6] In applying for final payment, the contractor had to follow the procedures set forth for progress payments, including providing "an affidavit . . . stating that all previous progress payments received on account of the Work have been applied on account to discharge CONTRACTOR's legitimate obligations associated with prior Applications for Payment." (*Id.* § 14.02(A)(2), 14.07(A)(1)).

14.07(A)(2), (3)).  Once the engineer was satisfied that the work was completed and all of

the contractor's obligations under the Contract were fulfilled, it would either recommend

that the owner make final payment or it would return the application to the contractor

with its reasons for refusal.  (*Id.* § 14.07(B)).  In the latter situation, the contractor was to

make "the necessary corrections" and resubmit the application.  (*Id.*).  The owner had to

make final payment within 30 days of receiving the engineer's recommendation for

payment.

### C.      BWSC's Alleged Prior Knowledge of Problems with the Foundation

#### *i.*      The Underground Stream

One of the major problems during the Project involved an underground stream

located on the property.  Soon after construction began, the site work contractor

discovered underground water, initially believed to be an isolated pocket.  (Doc. # 66 Ex.

9, Wolfe Aff. at 2).  It was later discovered that the water was actually an underground

stream.  (*Id.*).  BWSC had been involved with several projects on the property in question

since 1997.  (Doc. # 56 Ex. 3, Mott[7] 22:1–25:5).  Glenn Construction claims that BWSC

knew of the underground stream before the Project began because of its prior work at the

location.[8]  Glenn Construction claims that BWSC had geotechnical reports and a

topographical map prior to the Project that showed the underground stream. (Doc. # 66, at

---

[7]  James Barry Mott ("Mott") is the Vice President of BWSC.  (Doc. # 56 Ex. 3, Mott
Dep. 16:8–10).

[8]

7; *id.* Exs. 10–11; *see also* Doc. # 56 Ex. 3, Mott Dep. 24:2–9, 25:7–11). Wolfe, one of the owners of Glenn Construction, stated that a contractor who had previously worked on a BWSC project at the same location had encountered similar water issues on the previous project and had informed BWSC of them. (*Id.* (citing Doc. # 66 Ex. 9, Wolfe Aff. at 4)). BWSC contends that it "did not have knowledge of the existence of the underground stream until it was discovered by [Glenn Construction] during the [P]roject." (Doc. # 50, at 2 (citing Doc. # 56 Ex. 2, Cole Dep. 157:1–158:25, 160:3; Ex. 3 Mott Dep. 25:12–26:9)).[9]

### ii.   The Anticipated Column Loads

Glenn Construction contends that BWSC miscalculated the anticipated column loads for the foundations which allegedly caused significant delays on the project. The column load is the "outward force pushing the columns horizontally at the point where they connect to the foundation." (Doc. # 66, at 4). Glenn Construction claims that BWSC knew of the miscalculation prior to submitting the Project to bid. In July 2006, Ted Persing ("Persing"), a structural engineer at BWSC, instructed Michael Cole ("Cole"), the

---

[9] Prior to bidding, BWSC contracted with Carmichael Engineering "to perform geotechnical site work in preparation of the Project." (*Id.*). However, Glenn Construction alleges that the initial report from Carmichael Engineering "failed to recognize any significant underground water features." (*Id.*). After discovery of the underground stream, Carmichael Engineering issued a supplement to their report on February 24, 2007, acknowledging the existence of "an old drainage feature . . . [that had] been filled in along the eastern section of the planned aircraft pad." (Doc. # 66 Ex. 15). According to Glenn Construction, this supplemental report was initially withheld by BWSC and only forwarded to Glenn Construction after it had stopped work due to the soil conditions. (Doc. # 66 Ex. 9, Wolfe Aff. at 2–3).

Project Coordinator at BWSC, to include in the Requests for Proposals that "the largest anticipated column load is approximately 70" kps.  (Doc. # 66 Ex. 1).  In September of 2006, Persing received estimated column loads for a metal building of the same size and shape as the Project's hangar.  (Doc. # 66 Ex. 2).  However, Glenn Construction claims that these were "generic designs" that "did not contain several features specific to the Project that would add additional . . . loads, including sprinkler and fire suppression systems and a ten ton crane."  (Doc. # 66, at 4).  According to Glenn Construction, BWSC included these generic loads into the Requests for Proposals without recalculating them "to reflect the increase caused by these additional features."  (*Id.*).  On December 18, 2006, BWSC issued final construction plans establishing that it was "solely responsible" for the design of the foundation, including the columns.  (*Id.* (citing Doc. # 66 Ex. 4)).

Glenn Construction claims that BWSC knew of the miscalculated loads.  On January 3, 2007, a bidder and potential contractor e-mailed BWSC stating that its own metal building manufacturer had calculated an approximate column load of 164 kps for one of the columns—over twice as much as originally calculated.  (Doc. # 66 Ex. 5).  The bidder confirmed this load calculation two weeks later and asked BWSC to review the loads and determine whether the foundations needed to be redesigned.  (Doc. # 66 Ex. 6).  Despite this information, the drawings given to the bidders reflected only a 76 kps load.  These same drawings were later incorporated into the Contract.  (Doc. # 66 Ex. 7).

Eventually, as discussed further below, BWSC revised these drawings during the Project to reflect increased column loads.

### D.    Problems with the Metal Hangar Designs

While BWSC was solely responsible for the design and construction of the foundation, Glenn Construction contracted with a metal building manufacturer—OSI Building Systems, Inc. ("OSI")—to design and build the metal hangar.  (Doc. # 50, at 5). According to Glenn Construction, BWSC represented at a pre-bid meeting that it "would send a structural engineer to whomever the metal building subcontractor was to review metal building submittals on site."  (Doc. # 66, at 6 (citing Doc. # 56 Ex. 2, Cole Dep. 139:1–141:2); Doc. # 66 Ex. 9, Wolfe Aff. at 1–2).  Cole, BWSC's coordinator on the Project, admitted that such a practice would be atypical but that it would expedite the schedule by allowing the engineers to review the materials together and avoid "lag time for deliveries."  (Doc. # 56 Ex. 2, Cole Dep. 139:20–140:4; *see also* Doc. # 66 Ex. 9, Wolfe Aff. at 1–2).  BWSC claims that its intent throughout the Project was to expedite the review of submittals, including by "sending engineers to the site of the metal building manufacturer."  (Doc. # 50, at 3 (citing Doc. # 56 Ex. 3, Mott Dep. 33:14–34:11)).

In order to design and fabricate the hangar, OSI needed a set of drawings.  BWSC instructed Glenn Construction to have its subcontractors access BWSC's website and download drawings as needed.  (Doc. # 66 Ex. 9, Wolfe Aff. at 5).  BWSC provided the website address, username, and password required to access the drawings and "advised

[Glenn Construction] to forward it to all subcontractors and suppliers for their use." (*Id.*).

However, the drawings posted by BWSC on the website and downloaded for use by OSI

"were obsolete and not identical to the printed sets provided to Glenn Construction."

(*Id.*).[10]  However, because both drawings were stamped "ISSUED FOR

CONSTRUCTION, Dated 12/18/2006," Cole admitted that it was impossible to discern

from the scanned drawings on the website that they were not final.  Wolfe testified that

the miscalculation of the loads and posting of obsolete drawings combined to

significantly delay the Project.  (Doc. # 66 Ex. 9, Wolfe Aff. at 5–6).

As Wolfe testified, "[i]t takes 12–16 weeks to fabricate a metal building once

plans are approved." (*Id.* at 6).  On March 5, 2007, Glenn Construction notified BWSC

that the OSI drawings would be available for BWSC's review on March 13, 2007.  (*Id.*).

However, despite BWSC's pre-bid promise to review the drawings on site, Cole informed

Wolfe that BWSC would not do so unless Glenn Construction paid for the cost of sending

the engineer.  (*Id.*).[11]  On March 13, 2007, OSI completed the design based on the

---

[10]  Indeed, Wolfe testified that BWSC "acknowledged . . . that the drawings on the website had not been revised as the ones provided on paper." (*Id.*).  The drawings on the website included two notes concerning load not included in the final hard copies.  (Doc. # 56 Ex. 2, Cole Dep. 121:18–124:7).  The failure to remove these loads on the scanned copies resulted in them showing "a higher loading" than the final paper copies because the notes concerned "additional loads that had already been included in the collateral loads." (*Id.* 123:18–124:7).  Glenn Construction contends that these notes "would affect the OSI design of the hangar superstructure." (Doc. # 66, at 12).

[11]  Wolfe further testified that when he complained, Cole "admitted that even if Glenn [Construction] paid the cost, BWSC would not be able to send a licensed Alabama engineer who could approve OSI submittals." (Doc. # 66 Ex. 9, Wolfe Aff. at 6).

obsolete drawings downloaded from the website.  (*Id.*).  BWSC received OSI's drawings

through the mail on March 14, 2007.  (Doc. # 66 Ex. 16).  BWSC determined that the

drawings were incorrect and provided comments within 24 hours.  (*Id.*).

On March 22, 2007, BWSC received a second submittal from OSI.  (*Id.*).  Wolfe

claims that BWSC promised to return their comments the "next day."  (Doc. # 66 Ex. 9,

Wolfe Aff. at 6).  However, BWSC again returned the submittal on April 3, 2007 with

instructions to "revise and resubmit."  (Doc. # 66 Ex. 16).  During an April 4, 2007

conference call, the parties realized that scanned drawings OSI used were obsolete. (Doc.

# 66 Ex. 9, Wolfe Aff. at 7; *see also id.* Exs. 17–18).  The following day, Glenn

Construction submitted a revised schedule indicating that the time for completing the

metal hangar had been pushed back by two months.  (Doc. # 66 Ex. 9, Wolfe Aff. at 7).

Finally, on April 19, 2007, OSI mailed submittals based on the correct drawings to

BWSC, who received them the next day.  (*See id.*; Doc. # 66 Ex. 16).  At this time, Glenn

Construction stated its belief that the planned installation of a twenty-foot crane would be

impossible because "[t]he combination of the loading requirements and a height

limitation on the building would not allow a 20-foot crane lift height."  (Doc. # 66 Ex. 9,

Wolfe Aff. at 7–8).  On May 1, 2007, BWSC disapproved OSI's designs, in part, because

they could not meet the twenty-foot crane height requirement.  (Doc. # 66 Ex. 9, Wolfe

Aff. at 9).  Later in May, BWSC suggested changing the slope of the hangar building to

accommodate the crane height requirements; however, Glenn Construction alleges that

such a change would require OSI to completely redesign the hangar. (*Id.*). "On May 9, 2007, OSI notified BWSC [that] . . . the hangar could not be built even as originally designed by BWSC." (*Id.* at 10; *see also* Doc. # 66, at 15). On May 13, 2007, BWSC again told OSI to "revise and resubmit" their drawings. (Doc. # 66, at 15). Eventually, Bell Aero approved a crane height of less than twenty feet. (Wolfe Aff., Ex. 9, at 8). OSI notified Glenn Construction that the fourth and final design package would be ready for review on May 18, 2007. (*Id.*). That day, BWSC sent engineer Michael Petrin ("Petrin") to review the documents in Montgomery, Alabama. (Doc. # 69 Ex. 4, Ashley[12] Dep. 27:7–28:8).

### E. Problems with the Foundation's Pedestals

As previously discussed, BWSC included anticipated column loads for the foundations of approximately 70 kps in the Contract. However, on May 17, 2007, the day before BWSC approved OSI's final drawings for hangar, Dan Bartholomew ("Bartholomew")—BWSC's structural engineer of record for the Project—issued a revised set of structural drawings that listed anticipated column loads as high as 141 kps. (Doc. # 66 Ex. 8). The underground stream limited how deep the foundation could go into the ground. According to Glenn Construction, the shallower depth and the increased loads increased the requirements for the pedestals bearing the loads, including the pedestal size and the amount of reinforcing steel needed. (Doc. # 66, at 17). These

---

[12] Glenn Construction designated Stuart Ashley ("Ashley"), a professional engineer at OSI, as a non-retained expert witness.

changes particularly affected two types of pedestals: the type P-3 pedestals located along the side walls of the hangar and designed to bear the majority of the loads and the type P-3B pedestals located under the corners of the hangar supporting the hangar doors. Additionally, the new drawings added new P-3B pedestals that did not appear in the original drawings from December of 2006. (*Id.*).

With respect to the P-3 pedestals, Glenn Construction alleges that it's reinforcing subcontractor could not fit the reinforcing bars required by the revised drawings into the space indicated. (Doc. # 66 Ex. 9, Wolfe Aff. at 11). When Glenn Construction sought clarification from BWSC's on-site representative, the representative allegedly acknowledged an apparent engineering design problem and contacted the BWSC structural engineer. (*Id.*). According to Glenn Construction, after a ten-minute phone call and without checking structural design calculations, BWSC's representative conceded that the designs were defective and told Glenn Construction to deviate from the new designs. (*Id.*).[13] BWSC provided the reinforcing subcontractor with a revised plan for the P-3 pedestals; however, Glenn Construction informed BWSC that its drawings did not show which direction to orientate the hook on the dowels used in the reinforcements. (*Id.*). Glenn Construction also informed BWSC that its drawings were not done to scale

---

[13] Specifically, the reinforcing subcontractor found a conflict between the reinforcing bars, anchor bolts, and sheer lug end of the dowels needed to attach the bars of reinforced steel. BWSC's representative removed two of the reinforced bars, positioned the remaining bars, and instructed Glenn Construction to install the foundations using six dowels with a bend instead of the eight pieces indicated on the plans. (Doc. # 66 Ex. 9, Wolfe Aff. At 11).

and did not accurately show dimensions.  (*Id.*).  On July 5, 2007, Glenn Construction issued a formal Request for Information seeking clarification as to the reinforcing bars' placement in the drawings for the P-3 pedestals.  (Doc. # 66 Ex. 22).  That same day, Bartholomew issued two new revised drawings for the P-3 pedestals.

On July 11, 2007, Glenn Construction issued a Request for Information regarding problems with the P-3B pedestals.  (Doc. # 66 Ex. 25).  BWSC engineer Eriks Jekabsons ("Jekabsons") issued a response instructing Glenn Construction to remove two of the reinforcement bars.  (*Id.*).  That same day, Glenn Construction issued another Request for Information about the positioning of the anchor bolts in the revised drawings, and Jakabsens responded that the drawings were "for illustrative purposes only" and directed Glenn Construction to "field adjust to accommodate [the] anchor bolts."  (Doc. # 66 Ex. 26).  The following day, Glenn Construction issued another Request for Information asking BWSC to run the reinforcement data through a three-dimensional ("3D") software program.  Glenn Construction claimed that the program would show BWSC the impossibility of fitting the designs into the space.  (Doc. # 66 Ex. 27).  Glenn Construction told BWSC that "the drawings are inadequate to accurately locate the reinforcements" and asked BWSC to revise them.  (*Id.*).  Jekabsons again responded that the drawings were "for illustrative purposes only."

On July 23, 2007, Mott sent an email to BWSC employee's expressing concern about producing a 3D drawing.  (Doc. # 66 Ex. 29).  Specifically, he was worried

because, "[u]p until this point, [BWSC] had told [Glenn Construction] that it is not [BWSC's] responsibility to do this" and because he could "see [Glenn Construction] saying that if BWSC had done this four weeks ago, there would not [have been] any delays with the rebar placement." (*Id.*). That same day, Petrin responded and told Mott that he had "asked [BWSC's] structural group to draw a plan and section (not a 3D drawing) showing all bars drawn to scale in the correct locations." (*Id.*). Petrin assured Mott that the drawings were "intended for internal use" and not for issuance to Glenn Construction. (*Id.*). Petrin testified that he asked for these to-scale drawings to make sure that BWSC's designs were possible. (Doc. # 69 Ex. 1, Petrin Dep. 161:7–164:18). Glenn Construction never saw the internal drawings during the Project.[14] On July 25, 2007, Glenn Construction again sent a Request for Information stating that its "drawings do not have dimensions for the proper placement of the reinforcement." (Doc. # 66 Ex. 28).

Glenn Construction claims that BWSC admitted on July 27, 2007 that it was physically impossible to fit the required number and type of reinforcement bars in the space called for in the drawings. (Doc. # 66 Ex. 9, Wolfe Aff. at 13). BWSC then instructed Glenn Construction to stagger the reinforcing bars so that they would overlap

---

[14] Initially, the parties believed that these internal, allegedly to-scale drawings were no longer in existence. (Doc. # 66 Ex. 30; *see also* Doc. # 78). However, after the motions for summary judgment were filed, the parties were able to locate the internal drawings in BWSC's initial disclosures. These internal drawings as well as a second affidavit by Wolfe are the subject of Glenn Construction's motion to supplement. (Doc. # 78).

each other. (*Id.*). BWSC, Glenn Construction, and Bell Aero held an on-site meeting. (*Id.*). Neither of the two persons sent by BWSC were licensed structural engineers, but they told Glenn Construction to "field adjust" in placing the reinforcing steel. (*Id.*).[15] Wolfe told BWSC that the structural engineer of record would need to approve any changes to the placement or permit someone to make that approval on his behalf. (*Id.*). On August 14, 2007, Glenn Construction requested that the structural engineer of record, Bartholomew, inspect and approve the pedestal reinforcement. (*Id.* at 15). BWSC agreed to send a representative to inspect the pedestals. (*Id.*). On August 17, 2007, BWSC sent Robert Caster ("Caster"), an employee of BWSC's consulting structural engineer PSI, instead of Bartholomew. (*Id.*). Glenn Construction alleges that Castor twice falsely represented that he was a licensed professional structural engineer in Alabama. (*Id.*).

On August 20, 2007, Glenn Construction outlined the continuing problems with the reinforcement bars to BWSC, stating in pertinent part:

> We are at a work stoppage on the P3 & P3B pedestals due to continuing conflict with embedded items, anchor bolts and reinforcement. We have repeatedly requested accurately dimensioned or scalable drawings to properly [do] the reinforcement in these pedestals. BWSC has refused to provide these drawings . . . . Had BWSC taken the time to review the 'detail drawings' as

---

[15] On August 2, 2007, BWSC published and distributed Sketch No. SK-P3B which indicated how the bearing plates on the reinforcing bars bearing plates were to overlap. (*Id.*). However, this drawing failed to have the large nuts that held the plates in position drawn to scale. (*Id.*). Glenn Construction alleges that had BWSC drawn to scale, then it "would have discovered that it was not possible to overlap the plates as indicated because of interference with the large nuts and the adjacent steel bearing plates." (*Id.*). Glenn Construction alleges that it advised BWSC of this fact. (*Id.*).

> requested they would have seen enormous conflict with these items and corrected them weeks ago.  These are structural issues that can only be resolved by the structural engineer of record.  This delay and obvious failure to cooperate has caused extensive delay of this project that continues today.

(Doc. # 68 Ex. 2).  That same day, Glenn Construction sent a letter to Bell Aero requesting assistance on the problems with the P3 and P3-B pedestals.  (Doc. # 68 Ex. 3).  Glenn Construction explained that, as per the Contract and building codes, BWSC needed to provide dimensioned drawings and that Glenn Construction could not place the reinforcements without these drawings.

Four days later, BWSC informed Glenn Construction that its "senior professional structural engineers [had] review[ed] the plans multiple times and . . . determined that there [were] no design problems with the plans."  (Doc. # 66 Ex. 9, Wolfe Aff. at 16).  Glenn Construction then "requested a copy of any and all reports issued by the consulting structural engineer PSI."  (*Id.*).  BWSC refused to provide the reports but agreed to inspect the pedestals and provide comments on any deficiencies.  (*Id.*).  Glenn Construction then told BWSC that it would be ready for installation of the pedestals on September 5, 2007 if BWSC would have a structural engineer available that day.  (*Id.*).  On September 5, 2007, BWSC sent a licensed structural engineer to the site.  The structural engineer told Glenn Construction to remove specific types of reinforcing bar assemblies and to place them into different locations than indicated on the drawings.  (*Id.* at 17).  Glenn Construction contends that it was generally able to proceed with its work on these pedestals unimpeded from that day forward.  (*Id.*).

### F.    Glenn Construction's Subcontractors

Glenn Construction also alleges that BWSC interfered with its subcontractors. For example, Glenn Construction contends that "BWSC directed the site work contractor to tear out and raise a storm water inlet" even though it had been installed according to the plans and specifications.  (*Id.* at 21).  Glenn Construction protested this action.  (*Id.* at 21).  Glenn Construction also alleges that BWSC directed the site work contractor to perform extra work that should have been covered by a change order.  (*Id.* at 20). According to Glenn Construction, BWSC later changed its mind.  (*Id.*).

According to Glenn Construction, BWSC and Bell Aero pressured it into firing its concrete contractor, Skipper Construction Company ("Skipper Construction").  BWSC allegedly later hired that contractor.  Bell Aero points out that Skipper Construction and another subcontractor, Team Building Construction, were not licensed as required by Alabama law.  *See* Alabama's General Contractor's Practice Act ("AGCPA"), Alabama Code § 34-8-1 *et. seq.*; Doc. # 57 Exs. 39–40.  Wolfe stated that Skipper Construction provided him "with a false contractor's number" while Team Building "did little or no actual work on the [P]roject."  Wolfe testified that he did not check with the Alabama Licensing Board for General Contractors to see if Skipper Construction was licensed, nor did he get any references from Skipper Construction.  (Doc. 57 Ex. 3, Wolfe Aff. 228:11–229:15).  Bell Aero further points out that Glenn Construction's subcontractors also delayed the Project and that Glenn Construction back-charged Skipper Construction

for $415,548.62 for delays and defective work. (Doc. # 55, at 5; *id.* Ex. 45).

### G.    Glenn Construction's Alleged Claim Submission and Completion of the Project

In the midst of the problems associated with the Project, Glenn Construction contends that it submitted its first claim on July 6, 2007 requesting that BWSC approve an increase the Contract price and an extension of the Contract time.  This claim described the allegations regarding the underground stream, the posting of obsolete drawings to the website, the revised drawings for the foundations, and BWSC's failure to provide to-scale drawings.  (Doc. # 68 Ex. 10).[16]  However, on August 7, 2007, BWSC requested additional information to determine the extent of damages.  (*Id.* Ex. 11).  Glenn Construction replied on August 14, 2007 and stated that damages had increased since the claim's filing.  (*Id.* Ex. 12).  Nearly a month later, on September 25, 2007, BWSC responded again to the July 6, 2007 claim and again asked Glenn Construction for more documentation.  (*Id.* Ex. 42).  Wolfe testified that, on September 27, 2007, all three parties "agreed to table any claims process to allow construction to proceed."  (Doc. # 66 Ex. 9, Wolfe Aff. at 18).

---

[16]  Under the claims process in the Contract, Glenn Construction must submit written notice of a claim or dispute to BWSC and Bell Aero within thirty days of "the start of the event giving rise" to the claim.  (Doc. # 57 Ex. 1, General Conditions § 10.05(A)).  Glenn Construction must then provide notice of the amount or extent of the claim and "supporting data" within sixty days of the start of the event unless BWSC allows additional time for it to submit supporting data.  (*Id.*).  Bell Aero is given thirty days to respond after receipt of the last of these submissions.  BWSC is to act as an impartial judge and resolve the dispute between the parties. (*Id.* § 9.09(B)).

According to Glenn Construction, it substantially completed the Project on February 28, 2008 and attempted to schedule an inspection of the hangar building. (Doc. # 66 Ex. 9, Wolfe Aff. at 18). BWSC declared substantial completion on March 14, 2008. (Doc. # 68 Ex. 4). Three days later, BWSC certified Glenn Construction's application for all remaining payments under the Contract except for $6,933.33 needed to fully complete the Project and the five percent retainage of $302,750.62. (Doc. # 68 Ex. 5). By approving this application, BWSC "certified . . . that to the best of [BWSC's] knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED." (*Id.*). By this point, the total Contract price had increased to $6,061,945.89 and BWSC had approved payments totaling $5,752,261.74, including those requested in this application. (*Id.*). The parties had also increased the Contract time by 15 days and gave Glenn Construction credit for an additional 14 days for delays at the beginning of the Project. (Doc. 55, at 5; Doc. # 57 Ex. 5). Thus, the Project was deemed 98.89% complete. (Doc. # 68 Ex. 5). However, BWSC had not yet ruled on Glenn Construction's alleged claim for additional increases in time and price.

On June 18, 2008, Glenn Construction issued an application for final payment, seeking payment of the balance of the Contract and the retainage. (Doc. # 68 Ex. 15). On July 7, 2008, BWSC sent a letter to Bell Aero advising it not to process any paperwork

from Glenn Construction without BWSC's review.  (*Id.* Ex. 16).  BWSC claimed that Glenn Construction's application was deficient because Glenn Construction had failed to (1) complete items on the punch list, (2) provide submittal documents, (3) provide its subcontractors' lien wavers, and (4) provide an all-bills-paid affidavit.  On September 3, 2008, Glenn Construction requested a final decision on its July of 2007 claims and allegedly submitted additional claims.  (*Id.* Ex. 20).  Glenn Construction and BWSC corresponded back and forth over the next several months whereby BWSC sought additional documentation and Glenn Construction insisted that it had complied with the Contract's requirements for submittals of claims.  (*Id.* Exs. 21–29).  According to Defendants, Glenn Construction did not follow the Contract's claim procedure because it refused to provide the proper supporting data.  On January 12, 2009, BWSC informed Glenn Construction that it had not filed a cognizable claim under the Contract because of the lack of supporting data.  However, it went ahead and denied the alleged claims. Glenn Construction contends that it was not aware of any decision as to the claims until early February 2009.

## II.  Procedural History

Glenn Construction filed suit on March 25, 2009.  On November 9, 2010, Bell Aero filed its first motion for summary judgment.  (Doc. # 32).[17]  On January 14, 2011,

---

[17]  This first summary judgment motion stemmed from requests for admissions which Glenn Construction which became admitted by operation of law when Glenn Construction did not respond.  On November 30, 2010, Glenn Construction was permitted to amend its responses. (Doc. # 43).

BWSC and Bell Aero filed two more motions for summary judgment.  (Docs. # 49, 54).

Glenn Construction responded on February 7, 2011 and included an affidavit by Mac

Brittingham ("Brittingham"), a retained expert.  (Docs. #66–68).  BWSC moved to strike

Brittingham's affidavit.  (Doc. # 75).  On February 16, 2011, Glenn Construction filed a

motion to supplement its evidentiary submission for its response to summary judgment.

(Doc. # 78).  BWSC opposed this motion to supplement and moved to strike it.  (Doc. #

82).  Finally, on February 28, 2011, Glenn Construction moved to strike the affidavits of

two of BWSC's non-retained experts.  (Doc. # 80).

## SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate "if

the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v.

Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. Pro. 56(a).  The party asking for

summary judgment "always bears the initial responsibility of informing the district court

of the basis for its motion, and identifying those portions of 'the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any,'

which it believes demonstrate the absence of a genuine issue of material fact."[18]  *Celotex*.

---

[18] "An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is 'merely colorable' or is 'not significantly probative.'" *Lewis*, 908 F. Supp. at 943–44. (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).  "Similarly, a fact is not material unless it is identified by the controlling substantive law as an essential element of the

477 U.S. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322–23; *see also Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–16 (11th Cir. 1993) ("For issues, however, on which the non-movant would bear the burden of proof at trial, . . . '[t]he moving party may simply show[]—that is, point[] out to the district court—that there is an absence of evidence to support the non-moving party's case.'") (quoting *U.S. v. Four Parcels of Real Property*, 941 F.2d 1428, 1437–38 (11th Cir. 1991)).

Once the moving party has met its burden, the non-movant must "go beyond the pleadings" and show that there is a genuine issue for trial.  *Celotex*, 477 U.S. at 324; *see also* Fed. R. Civ. Pro. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.").  *To avoid summary judgment, the nonmoving party "must do more than simply show that there is some*

nonmoving party's case."  *Id.* at 944 (citing *Anderson*, 477 U.S. at 248).

25

*metaphysical doubt as to the material facts*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (emphasis added). A plaintiff must present evidence demonstrating that he can establish the basic elements of his claim. *Celotex,* 477 U.S. at 322. A court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson*, 477 U.S. at 255. After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a).

## DISCUSSION

### I.     BWSC's Motion for Summary Judgment

#### A.     Fraud

Glenn Construction brings the following fraud claims: (1) BWSC fraudulently suppressed the existence of the underground stream; (2) BWSC fraudulently misrepresented the provision of structural engineering services; (3) BWSC fraudulently misrepresented the turnaround of submittal approvals; (4) BWSC fraudulently misrepresented that its original metal building designs were adequate; and (5) BWSC misrepresented that its foundation design were adequate. (Doc. # 1, at 50–52 ¶¶ 221–229).[19]

---

[19] In its response, Glenn Construction appears to contend that it has fraudulent suppression claims regarding the column loads and BWSC's internal pedestal drawings. (Doc. #

26

### i.   Fraudulent Suppression of the Underground Stream's Existence

Under Alabama law, a plaintiff must prove five elements to establish a claim for fraudulent suppression:

> (1) that the defendant had a duty to disclose an existing material fact; (2) that the defendant suppressed that existing material fact; (3) that the defendant had actual knowledge of the fact; (4) that the defendant's suppression of the fact induced the plaintiff to act or to refrain from acting; and (5) that the plaintiff suffered actual damage as a proximate result.

*State Farm Fire & Cas. Co. v. Slade*, 747 So. 2d 293, 323–24 (Ala. 1999) (citations omitted); *see also* Ala. Code § 6-5-102 ("Suppression of a material fact which the party is under an obligation to communicate constitutes fraud.").  BWSC contends that Glenn Construction cannot establish the third element—namely, that BWSC had actual knowledge of the underground stream prior to Glenn Construction's discovery of it.  *See Glass v. S. Wrecker Sales*, 990 F. Supp. 1344, 1350 (M.D. Ala. 1998) (Albritton, J.) ("An action for suppression will lie only if the defendant actually knows the fact alleged to be suppressed.") (citing *McGarry v. Flournoy*, 624 So. 2d 1359 (Ala. 1993)).  Glenn Construction, on the other hand, argues that it has presented sufficient admissible evidence to create a genuine issue of material fact as to whether BWSC had actual knowledge of the underground stream prior to Glenn Construction's discovery of it.

---

66, at 50).  A close reading of the Complaint reveals no factual allegations supporting such claims.  As such, Glenn Construction cannot bring the fraudulent suppression claims regarding the BWSC internal drawings and the column loads.  *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314 (11th Cir. 2004) (per curiam) (holding that the liberal pleading standard does not allow a plaintiff to raise a new claim at the summary judgment stage). However, the Court will consider this evidence as it relates, if at all, to the claims properly pled in the Complaint.

Specifically, Glenn Construction points to the following facts: (1) BWSC had been involved in several projects on the property in question since 1997; (2) BWSC was aware of and had several geotechnical reports done on that property before December of 2006; (3) BWSC had a topographical map prior to 2005 which showed the presence of an old stream within the Project's location; and (4) a contractor who had previously worked with BWSC on a project at the site informed Wolfe that he had encountered similar issues with underground water and had advised BWSC of it.

Again, BWSC contends that "there is absolutely no admissible evidence that BWSC had any knowledge of the underground stream prior to its discovery during construction."  (Doc. # 50, at 10; Doc. # 76, at 12).  Although BWSC does not explain it as such, it appears that the contractor's statements about previously discovering and advising BWSC of underground water is inadmissible hearsay that this Court cannot consider on summary judgment because it is not reducible to admissible form at trial.  *See Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996) ("[The plaintiff] cannot use inadmissible hearsay to defeat summary judgment when that hearsay will not be reducible to admissible form at trial."); *see also Macuba v. DeBoer*, 193 F.3d 1316, 1325 (11th Cir. 1999) (holding that the district court impermissibly considered inadmissible hearsay because it would not be admissible at trial under an exception to the hearsay rule). However, BWSC fails to explain or argue why the remaining pieces of evidence are inadmissible.

28

Upon consideration of these first three pieces of evidence, this Court is satisfied that a reasonable jury could find that BWSC possessed documents—either the geotechnical reports or the cited topographical map—showing the underground stream's existence because of its prior work on other projects in the location.  Thus, a reasonable jury could find that BWSC had actual knowledge of the underground stream.  *See e.g.*, *Roland v. Cooper*, 768 So. 2d 400, 406 (Ala. Civ. App. 2000) (holding that documents in the defendant's possession which demonstrated the fact he allegedly suppressed were sufficient to create a genuine issue of material fact).  In other words, if a jury finds that BWSC possessed these documents, it could also find that BWSC had actual knowledge of the underground stream.  On the other hand, a reasonable jury could find that BWSC had no actual knowledge of the underground stream.  Such a genuine issue of material fact precludes this Court from granting BWSC summary judgment on this claim.  Thus, BWSC's motion for summary judgment, (Doc. # 49), is due to be DENIED with respect to the claim of fraudulent suppression regarding the underground stream's existence.

### *ii.* **The Remaining Fraud Claims**

Alabama law provides causes of action for both fraud, also called legal fraud, and promissory fraud.  Under Alabama law, "fraud is the false representation of a *material existing fact* inducing reliance and causing damages."  *Green Tree Acceptance, Inc. v. Doan*, 529 So. 2d 201, 206 (Ala. 1988) (citing Ala. Code §§ 6-5-101 (1975) *et seq.*) (per curium) (emphasis in original).  Thus, to establish a prima facie case of fraudulent

misrepresentation under Alabama law, a plaintiff must show "(1) that [the defendant] made a false misrepresentation, (2) that the misrepresentation involved a material [existing] fact, (3) that the [plaintiff] relied on the misrepresentation, and (4) that the misrepresentation damaged the [plaintiff]." *AmerUs Life Ins. Co. v. Smith*, 5 So. 3d 1200, 1207 (Ala. 2008); *accord Eley v. Travelers Ins. Co.*, No. 2:09-cv-958-MEF, 2011 U.S. Dist. LEXIS 16528, at *29–30 (M.D. Ala. Feb. 18, 2011) (Fuller, C.J.); *AstraZeneca LP v. State*, 41 So. 3d 15, 26 (Ala. 2009). There is no requirement of fraudulent intent when bringing a claim for fraud based upon misrepresentation of a material existing fact. Ala. Code § 6-5-101 ("Misrepresentations of material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, *or if made by mistake and innocently* and acted on by the opposite party, constitute legal fraud.") (emphasis added); *accord Eley*, 2011 U.S. Dist. LEXIS 16528 at *28; *Burlington N. R.R. Co. v. Warren*, 574 So. 2d 758, 766–77 (Ala. 1990); *Coaker v. Washington Cnty. Bd. of Educ.*, 646 So. 2d 38, 42 (Ala. Civ. App. 1993).

Promissory fraud, on the other hand, occurs by the failure to perform a promise—*i.e.* the failure to perform some promised future act. S*ee, e.g. Eley*, 2011 U.S. Dist. LEXIS 16528 at *39 n.12; *Scott v. United of Omaha Life Ins. Co.*, 749 F. Supp. 1089, 1093 (M.D. Ala. 1990) (Hobbs, J.); *Brown-Marx Assocs., Ltd. v. Emigrant Sav. Bank*, 703 F.2d 1361, 1370–71 (N.D. Ala. 1983). In order to establish promissory fraud, a plaintiff must also prove "that at the time the promise was made, there was an intent not

30

to perform the promised act." *Green Tree Acceptance*, 529 So. 2d at 206 (citing Ala. Code § 6-5-102; *Purcell Co. v. Spriggs Enters., Inc.*, 431 So. 2d 515, 519 (Ala. 1983)). Furthermore, the mere failure to fulfill the promise is insufficient to establish an intent to deceive. *See, e.g.*, *Scott*, 749 F. Supp. at 1093 ("[U]nder Alabama law the failure to perform a promise is not itself sufficient to support a charge of fraud. Absent any evidence from the plaintiff that the representation was made with the intent to deceive, the fraud count fails.") (citations omitted); *Brown-Marx*, 703 F.2d at 1370 ("[U]nder Alabama law failure to fulfill promises does not give rise to actionable fraud unless it is alleged and proved that the representations were made with intent to deceive and with no intent at the time the representations were made to carry them out. Failure to perform a promise is not of itself adequate evidence of intent to support an action for fraud.") (citations omitted).

***a. Fraudulent Misrepresentation of the Turnaround of Submittal Approvals: BWSC's Pre-Bid Statement Regarding the Review of the Hangar Submittals***

Here, BWSC argues that its representation during the pre-bid meeting that it would send a structural engineer to review metal building submittals on site is a claim for promissory fraud. (Doc. # 50, at 11). This Court agrees that this representation was not made regarding a material existing fact, but rather was a promise to perform a future act. *See, e.g.*, *Penmont, LLC v. Blue Ridge Piedmont, LLC*, 607 F. Supp. 2d 1266, 1273 (M.D. Ala. 2009) (Thompson, J.) (holding that the defendant's statement that it would return a

non-refundable earnest purchase deposit if a commercial real-estate transaction did not go through was promissory fraud). BWSC further argues that Glenn Construction cannot establish an intent to deceive at the time this misrepresentation was made. (Doc. # 50, at 11; Doc. # 76, at 12–13). Glenn Construction correctly points out that "[t]he question of the defendant's intention in making the alleged representation is ordinarily a question of fact for the jury." (Doc. # 66, at 48) (quoting *Hillcrest Ctr., Inc. v. Rone*, 711 So. 2d 901, 905 (Ala. 1997) (citations omitted)).

However, the only evidence before this Court with respect to this promise is that BWSC refused to send their structural engineer to the metal building manufacturer unless Glenn Construction paid for it and that, when a structural engineer was sent months later, it was not the structural engineer of record. (Doc. # 66, at 6). "[T]he plaintiff must show more than that the defendant failed to fulfill the promised act." *Hillcrest*, 711 So. 2d at 905 (quoting *Nat'l Sec. Ins. Co. v. Donaldson*, 664 So. 2d 871, 876 (Ala. 1995)); *see also Rhodes v. Unisys Corp.*, 170 Fed. Appx. 681, 683 (11th Cir. 2006) (affirming summary judgment on a promissory fraud claim because the plaintiff's only evidence of an intent to deceive was an "attempt[] to rely on an inference of intent not to perform, which might be drawn from [the defendant's] failure to perform, rather than providing any actual evidence of [the defendant's] intent to deceive."). Indeed, Glenn Construction makes no argument with respect to the promise to send a structural engineer on site to review the

submittals for the metal hangar.[20]   Because there is no evidence before this Court sufficient to establish an intent to deceive regarding the promise to send a structural engineer on site to review the metal hangar submittals, BWSC is entitled to judgment as a matter of law as to this claim.   Thus, BWSC's motion for summary judgment, (Doc. # 49), is due to be GRANTED with respect to the claim of promissory fraud regarding the pre-bid promise to send a structural engineer to review the metal hangar submittals on site.

> **b.**   ***Fraudulent Misrepresentation of the Provision of Structural Engineering Services: Statements Made During Construction about Sending a Structural Engineer On Site to Inspect the Foundation***

Glenn Construction also brings promissory fraud claims based upon BWSC's several promises during construction to send a structural engineer on site to review the issues with the foundation.   (Doc. # 66, at 48–49).   In support of this claim, Glenn Construction points to BWSC's email exchange regarding the production of internal drawings and Mott's concern that Glenn Construction would rely upon them to claim that

---

[20]   In its Response, Glenn Construction contends that a jury could find that BWSC "intended to deceive Glenn Construction on several occasions."   (Doc. # 66, at 48).   It appears that this argument is relating to the promises to send a structural engineer on site to review the issues with the *foundation*, not the promise to have the structural engineer review the metal building submittals on site.   (*Id.* at 48–49 (arguing that the alleged concealment of internal drawings relating to the foundation and the refusal to send a structural engineer "to perform an onsite inspection" evidenced an intent to deceive because it would establish BWSC's plans for the foundation were wrong)).   None of this relates to an intent to deceive during the pre-bid meeting regarding BWSC's promise to send a structural engineer to review submittals for the metal hangar.

the weeks-long delays in the reinforcement bar placing was BWSC's fault.  (*Id.* at 48).

Glenn Construction contends that "a jury could also infer from this exchange that BWSC

did not intend to send a structural engineer to perform an [on-site] inspection at the time

the promise was made."  (*Id.*; *see also id.* at 49 ("[T]he jury could infer that the drawing

confirmed Glenn Construction's complaints about the P-3 and P-3B pedestals, and that

BWSC did not intend to send a structural engineer to the site because his visit [would]

similarly confirm that the drawings kept from Glenn Construction were right (and

BWSC's initial plans were wrong), and that BWSC would be 'liable' to Glenn

Construction for delays based on the confirmation.")).  BWSC contends that there is no

genuine issue of material fact and that the undisputed evidence demonstrates its intent to

expedite the Project. (Doc. # 76, at 13 (citing Doc. # 56 Ex. 3, Mott Dep. 33:14–34:11)).

However, this Court agrees with Glenn Construction that there is genuine issue of

material fact as to whether BWSC intended to deceive Glenn Construction when it

repeatedly promised to send a structural engineer to review the issues with the foundation

on-site.  Mott's email expressed concern about rendering 3D, to-scale drawings because

he could "see [Glenn Construction] saying that if BWSC had done this four weeks ago,

there would not [have been] any delays with the rebar placement."  (Doc. # 66 Ex. 29).

Indeed, Petrin responded to this concern by saying that the drawings would be kept

internal and never given to Glenn Construction.  (*Id.*).  A jury could reasonably infer that

BWSC did not want provide Glenn Construction with these drawings because they could

34

potentially demonstrate that BWSC's designs for the foundation were incorrect and that Glenn Construction was not at fault for the delay in placing reinforcement bars. Similarly, a jury could reasonably infer based on these emails that BWSC did not intend to send a structural engineer to perform an on-site inspection because that could also show Glenn Construction that the designs were defective and that Glenn Construction was not at fault for the delays.  Because a reasonable jury could find that BWSC intended to deceive Glenn Construction when it repeatedly said it would send a structural engineer to review the foundation issues on site, BWSC is not entitled to summary judgment on these promissory fraud claims.  Thus, BWSC's motion for summary judgment is due to be DENIED with respect to the promissory fraud claim regarding the promises made during construction to send a structural engineer to review the foundations on site.

>### c.     *The Fraudulent Misrepresentation Claim Regarding the Adequacy of the Designs for the Hangar and the Foundation*

With respect to the fraud claims regarding the adequacy of the BWSC's designs for the metal building and the foundation, BWSC argues that it is entitled to summary judgment because Glenn Construction "has offered no evidence that BWSC had any knowledge that the structural design of the metal building and foundation were inadequate."  (Doc. # 50, at 11).  However, whether the designs were adequate when BWSC made the representations relates to an *existing* fact and not a promise to perform some act in the future.  As previously stated, a Plaintiff need not establish an intent to deceive when bringing a fraud claim based upon a material existing fact.  Ala. Code § 6-

35

5-101 ("Misrepresentations of material fact made willfully to deceive, or recklessly without knowledge, and acted on by the opposite party, *or if made by mistake and innocently* and acted on by the opposite party, constitute legal fraud.") (emphasis added); *see also Eley*, 2011 U.S. Dist. LEXIS 16528 at *28 ("[F]raud under Alabama law need not include an intent to deceive or defraud.") (citations omitted); *Burlington*, 574 So. 2d at 766–77; *Coaker*, 646 So. 2d at 42. Because Glenn Construction need not establish that BWSC knew that the designs were inadequate and because BWSC makes no further argument with respect to these claims, BWSC is not entitled to judgment as a matter of law.[21] Thus, BWSC's motion for summary judgment, (Doc. # 49), is due to be DENIED with respect to the representations concerning the adequacy of the designs for the metal hangar and the foundation.

## B.     Intentional Interference with Contractual Relations

The elements for a claim of intentional interference with a contractual relationship are as follows: (1) the existence of an enforceable contract; (2) of which the defendant

---

[21] Glenn Construction cites to *Burlington*, 574 So. 2d at 767, for the proposition that statements of fact made recklessly, without knowledge, or by mistake, and acted upon are actionable even without fraudulent intent. (Doc. # 66, at 49). Glenn Construction also contends that, "[i]n other words, these drawings fraudulently misrepresented that the pedestals could be constructed in the manner described." (*Id.*). Although Glenn Construction does not make this same argument with respect to the design of the metal hangar, it is clear that the issue of the adequacy of the design for the metal building is also one relating to an existing fact. As courts may only grant summary judgment where the movant is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a), this Court cannot grant summary judgment to BWSC on the fraud claim relating to the design of the metal building based upon BWSC's alleged lack of knowledge where the claim does not require knowledge.

knew; (3) to which the defendant was a stranger; (4) with which the defendant intentionally interfered; and (5) damage.  *Compare White Sands Grp., L.L.C. v. PRS II, LLC*, 32 So. 2d 5, 14 (Ala. 2009) (describing the elements of a claim for tortious interference with *a business relationship* wherein the only difference is that the first element is "the existence of protectible business relationship") *with Hope for Families & Cmty. Serv. v. Warren*, 721 F. Supp. 2d 1079, 1077 (M.D. Ala. 2010) (Watkins, J.) (explaining that tortious interference with a business relationship is a separate tort from tortious interference with a contractual relationship because the latter "presupposes the existence of an enforceable contract" but that "[o]therwise, the elements of both torts overlap"); *see also MAC East, LLC v. Shoney's*, 535 F.3d 1293, 1297 (11th Cir. 2008) ("[A] tortious interference claim can be maintained only when the defendant is independent of or a stranger to the relation or contract with which he allegedly interfered.") (citing *Tom's Foods, Inc. v. Carn*, 896 So. 2d 443, 454 (Ala. 2004)).

Here, BWSC contends that it was not a "stranger" to the contractual relationship between Glenn Construction and Bell Aero and, thus, cannot be liable for tortious interference.  (Doc. # 50, at 12–14).  Glenn Construction contends that BWSC was a stranger to the Contract to the extent that it acted outside of its legal rights under the Contract.  (Doc. # 66, at 51–54).  Furthermore, Glenn Construction argues that BWSC intentionally interfered with its contractual relationships with its subcontractors when it provided designs directly to OSI over the website, directed Skipper Construction and the

37

site work contractor to perform extra work that should have been covered in a change

order, and directed the site work contractor to tear out a the properly installed storm water

inlet.  (*Id.* at 52).

### i.     The Claims for Intentional Interference with the Contractual Relations Between Glenn Construction and its Subcontractors

BWSC argues that Glenn Construction cannot bring tortious interference claims

based on the contractual relationships with the subcontractors because such claims were

not encompassed in the Complaint.  (Doc. # 76, at 13).  In support of this contention,

BWSC argues the following:

> [Count 3] alleges that BWSC interfered with Glenn Construction's
> 'performance' of its Contract. . . .   Glenn Construction was to tender such
> performance to the owner, Bell Aero.  However, Plaintiff's [Response] Brief
> alleges that BWSC interfered with Glenn Construction's Subcontractors
> performance to Glenn Construction.  Plaintiff has not alleged a cause of action
> in its Complaint for tortious interference with those relationships.

(*Id.* at 13–14).  "[I]f a plaintiff fails to plausibly allege a claim in [his] complaint, []he

may not amend [his] complaint through argument made in opposition to a defendant's

motion for summary judgment."  *Webster v. Wynne*, No. 2:08-cv-849, 2010 U.S. Dist.

LEXIS 136998, at *20 (M.D. Ala. Dec. 28, 2010) (Fuller, C.J.) (citing *Gilmour*, 382 F.3d

at 1314).

However, a review of the Complaint here reveals that Glenn Construction did, in

fact, sufficiently allege a claim for intentional interference with its contractual relations

with its subcontractors.  Count 3 itself lays out a claim for such tortious interference with

38

the contractual relationships with the subcontractors based upon BWSC's actions which allegedly led to Bell Aero denying payment to Glenn Construction.  (Doc. # 1, at 53 ¶ 234 ("BWSC also acted so as to prevent the timely payments of monies that were due and owing by Bell Aero with the result that Glenn Construction has been made the subject of claims of subcontractors and *Glenn Construction has been damaged in its relationship with said subcontractors* and other valuable business contacts.") (emphasis added)). Additionally, Count 3 incorporates all prior paragraphs in the Complaint.  (*Id.* at 52 ¶ 230).  These incorporated paragraphs includes sections entitled "Obsolete and Defective Structural Drawings Prepared by BWSC and Posted on BWSC Website" and "Interference with Subcontractors" which include the factual allegations underpinning these claims.  (*Id.* at 9–16  ¶¶ 43–86; *id.* at 39–40 ¶¶ 195–199).  As BWSC makes no further arguments regarding the claim of tortious interference with Glenn Construction's contractual relationships with the subcontractors, this Court finds that BWSC's motion for summary judgment, (Doc. # 49), is due to be DENIED with respect to the intentional interference claims regarding the contractual relations between Glenn Construction and its subcontractors.

> ### *ii.*    The Claims for Intentional Interference with the Contractual Relations Between Glenn Construction and Bell Aero

With respect to the tortious interference claims regarding Glenn Construction's contractual relationship with Bell Aero, BWSC contends that it was not a stranger to the Contract.  That BWSC be a stranger to the Contract is a necessary element of Glenn

39

Construction's prima facie case.  *See e.g.*, *MAC East*, 535 F.3d at 1297; *Waddell & Reed, Inc. v. United Investors Life Ins. Co.*, 875 So. 2d 1143, 1153 (Ala. 2003).  Glenn Construction cites to the case of *Colonial Bank v. Patterson* for the proposition that "when there exists a tri-partite relationship between the parties, a party . . . can be liable for tortuous interference when its conduct is not appropriate under its contract with the other two parties."  (Doc. # 66, at 51 (citing *Colonial Bank v. Patterson*, 788 So. 2d 134, 138 (Ala. 2000), *overruled on other grounds by White Sands Grp.*, 32 So. 3d at 14)).  Glenn Construction thus argues that BWSC was a stranger to the Contract because BWSC did not act within its rights under the tri-partite relationship.

Glenn Construction's argument arises from a misunderstanding of Alabama law.  The Alabama Supreme Court held in *Colonial Bank* that one cannot be liable for tortious interference "when tripartite relationships exist and disputes arise between two of the three parties" and the third party engages in conduct "that is appropriate under its contract with the other two parties."  788 So. 2d at 138 (citations omitted).  However, it did not hold that the opposite was true—*i.e.* that one whose conduct goes beyond its rights is automatically a stranger to the contract between the two other members of the tri-partite relationship.[22]  Indeed, this same argument was rejected by the Eleventh Circuit in *MAC*

_____

[22] Glenn Construction also relies upon *Waddell*, in which the plaintiff had argued that the defendant must be a stranger to the contract because its conduct was not appropriate under its contract with the other two parties.  875 So. 2d at 1155.  However, the Alabama Supreme Court did not decide this issue because it found that the defendant's conduct was indeed appropriate because it was "conduct a party has the legal right to take even if the plaintiff objects to the conduct."  Thus, the *Waddell* court did not hold that one who acts outside of his legal rights is

*East*, which held that the district court erred in finding that, in a tri-partite relationship, the defendant "effectively became a non-party or stranger to the business relation between [the plaintiff] and [a third party]" when it engaged in an unauthorized course of conduct. 535 F.3d at 1297. The Eleventh Circuit explained that Alabama law recognizes multiple situations in which a party is not a stranger to a contract. *Mac East*, 535 F.3d at 1297 ("A defendant is not a stranger to a contract or business relationship when: (1) the defendant is an essential entity to the purported injured relations; (2) the injured relations are inextricably a part of or dependent upon the defendant's contractual or business relations; (3) the defendant would benefit economically from the alleged injured relations; or (4) both the defendant and the plaintiff are parties to a comprehensive interwoven set of contract relations.") (quoting *Waddell*, 875 So. 2d at 1156); *see also Edwards v. Prime, Inc.*, 602 F.3d 1276, (11th Cir. 2010); *Atlanta Mkt. Ctr. Mgmt. Co. v. McLane*, 269 Ga. 604, 608 ([I]n order for a defendant to be liable for tortious interference with contractual relations, the defendant must be a stranger to both the contract *and* the business relationship giving rise to and underpinning the contract.") (cited with approval by *Waddell*, 875 So. 2d at 1154–55).

Here, it is undisputed that BWSC was hired as the engineer on the Project by Bell Aero. Thus, the Contract between Bell Aero and Glenn Construction is "inextricably dependent upon [BWSC's] contractual or business relations" with Bell Aero. *Mac East*,

─────────────────────

automatically a stranger for purposes of tortious interference.

41

535 F.3d at 1297 (quoting *Waddell*, 875 So. 2d at 1156).  Furthermore, BWSC's

agreement to act as the engineer on the Project and its performance as engineer were

essential to formation of the Contract and the completion of the Project.  *See Lynn v.

Romar Marina Club, LLC*, No. 07-0173-KD-C, 2009 U.S. Dist. LEXIS 111333, at

*56–57 (S.D. Ala. Dec. 1, 2009) (holding that the defendant was not a stranger to a real

estate transaction where his financing was essential to the ability of the parties to the

contract to close on the transaction and because he was involved in the comprehensive

interwoven set of contractual or business relations); *BellSouth Mobility, Inc. v. Cellulink,

Inc.*, 814 So. 2d 203, 214 (Ala. 2001) (holding that where a contract would not have been

consummated without the participation of a certain party, that party is "anything but a

stranger to the relationship") (citations omitted).  Furthermore, BWSC exercised control

over the relationship between Bell Aero and Glenn Construction because its

recommendations were necessary for submission of claims to Bell Aero and for Glenn

Construction to seek final payment.  *Tom's Foods, Inc. v. Carn*, 896 So. 2d 443, 454 (Ala.

2004) ("[A] defendant is not a party in interest to a [business or contractual] relationship

if the defendant has any beneficial or economic interest in, or control over, that

relationship.") (quoting *Waddell*, 875 So. 2d at 1154).  Thus, BWSC was not a stranger to

the Contract between Bell Aero and Glenn Construction.  This Court therefore holds that

BWSC's motion for summary judgment, (Doc. # 49), is due to be GRANTED with

respect to the intentional interference claim regarding Glenn Construction's contractual

relations with Bell Aero.

## C.     The Negligence Claims

The Alabama Supreme Court defines negligence as "the failure to do what a reasonably prudent person would have done under the same or similar circumstances." *Ford Motor Co. v. Burdeshaw*, 661 So. 2d 236, 238 (Ala. 1995) (citing *Elba Wood Prods., Inc. v. Brackin*, 356 So. 2d 119, 122 (Ala. 1978)); *accord Thomas v. Jim Walter Homes, Inc.*, 918 F. Supp. 1498, 1502–03 (M.D. Ala. 1996) (Albritton, J.). A plaintiff must establish four elements under a typical negligence claim: "(1) that the defendant owed a duty to the plaintiff; (2) that the defendant breached that duty; (3) that the plaintiff suffered a loss or an injury; and (4) that the defendant's negligence was the actual and proximate cause of that loss or injury." *Id.* (citing *Lollar v. Poe*, 662 So. 2d 902, 905 (Ala. 1993)); *accord Thomas*, 918 F. Supp. at 1503.  Furthermore, with respect to professional negligence claims, the Alabama Supreme Court has held the following:

> Alabama law requires that expert testimony establish the appropriate standard of care that professionals, such as architects and engineers, must exercise. *R.L. Reid, Inc. v. Plant*, 350 So. 2d 1022, 1027 (Ala. 1977).  This standard is based upon the learning, skill, and care ordinarily possessed and practiced by those ordinarily skilled in that profession. *Looker v. Gulf Coast Fair*, . . . 81 So. 2d 832, 835 (1919).

*Collins Co. v. Decatur*, 533 So. 2d 1127, 1134 (Ala. 1988).

The only argument that BWSC makes with respect to the negligence claims is that it has put forth expert testimony—namely, Cole and Petrin's affidavits—showing that all of the services performed by BWSC met the applicable standard of care.  (Doc. # 50, at

43

8).  Thus, BWSC contends that it is entitled to summary judgment because Glenn

Construction has presented no expert testimony as to the applicable standard of care and

breach by BWSC so as to create a genuine issue of fact.  In response, Glenn Construction

filed a motion to strike Cole and Petrin's affidavits.  (Doc. # 80).  Furthermore, it argues

that it need not have expert testimony as to the standard of care and breach by BWSC

where it is "so obvious that any reasonably person could see."  (Doc. # 66, at 44 (quoting

*Watson, Watson, Rutland/Architects, Inc. v. Montgomery Cnty Bd. of Educ.*, 559 So. 2d

168, 173 (Ala. 1990)).  Finally, Glenn Construction argues that, even if it is required to

have such expert testimony, then it has met that burden by virtue of Brittingham's

affidavit and Ashley's testimony.  (*Id.* at 42–44).  BWSC has filed a motion to strike

Brittingham's affidavit.  (Doc. # 75).

### i.    The Motions to Strike

Glenn Construction first seeks to strike the affidavits of Cole and Petrin on the

grounds that BWSC did not comply with the new Rule 26 of the Federal Rules of Civil

Procedure.  (Doc. # 75).  This amended rule became effective on December 1, 2010 and

requires parties to disclose the subject matter of a non-retained expert's expected

testimony as well as "a summary of the facts and opinions to which the witness is

expected to testify."  (Doc. # 80 (citing Fed. R. Civ. P. 26(a)(2)(C)).  However, the Court

need not consider whether the affidavits should be struck because BWSC would still be

entitled to summary judgment if Glenn Construction has failed to present any evidence as

44

to the standard of care and breach by BWSC.  *Celotex*. 477 U.S. at 322–23 (holding that the movant can meet its burden on summary judgment by showing that the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof); *accord Fitzpatrick*, 2 F.3d at 1115–16.  Thus, the ultimate issue is whether Glenn Construction has presented sufficient expert testimony regarding the standard of care and its breach by BWSC.  If it has, then either BWSC has failed in its initial burden to establish its entitlement to summary judgment or, in the alternative, Glenn Construction has demonstrated a genuine issue of material fact that should go to a jury.  Either way, summary judgment would be inappropriate.

Additionally, BWSC filed a motion to strike Brittingham's affidavit on the grounds that Glenn Construction failed to timely designate him as an expert.  That motion also need not be decided because Ashley's testimony covers the same issues as Brittingham's testimony—namely, that the revised designs for the drawings in May of 2007 were virtually impossible to construct and that BWSC failed in its responsibility to provide more detail once the congestion and conflict with the reinforcement bars came to its attention.  (Doc. # 68 Ex. 7, Brittingham Aff. at 2–4).  Because no one has moved to strike Ashley's testimony on substantially the same issues, this Court need not and will not consider Brittingham's affidavit.  In sum, Glenn Construction's motion to strike Cole and Petrin's affidavits, (Doc. # 80), and BWSC's motion to strike Brittingham's affidavit, (Doc. # 75), are both due to be DENIED as MOOT.

45

### ii.      Analysis of the Negligence Claims

In arguing that Glenn Construction failed to meet the expert testimony requirement, BWSC relies upon three Alabama Supreme Court cases.  Two of these cases, *Collins* and *Watson*, involved no expert testimony whatsoever by the plaintiff regarding the alleged bases of his claims.  In *Collins*, the plaintiff, a general contractor, sued the owner and engineer of a construction project for failing to advise him on the application of differing wage rates.  533 So. 2d at 1129.  Two experts testified in the case, and both stated that the engineer properly submitted the wage information to the plaintiff. *Id.* at 1134.  One further testified that it was "neither the custom nor practice in the State of Alabama for engineers to advise contractors what wages to apply to various portions of the construction project." *Id.*  As there was no other expert testimony, the Alabama Supreme Court affirmed a directed verdict for the defendants on this claim. *Id.*  The *Watson* case involved, in pertinent part, a claim by the owner of a building against the architect for that building with respect to the architect's alleged breach of a weekly inspection provision in the contract.  The alleged breach resulted in a leaking roof.  559 So. 2d at 169–70.  The Alabama Supreme Court noted that the plaintiff "presented no expert testimony regarding the [a]rchitect's inspections and any deficiencies in those inspections" nor did it present "expert testimony regarding the standard of care imposed within the architectural profession by the weekly inspection provision contained in this contract." *Id.* at 174.  Indeed, there was "no expert evidence that the standard was

breached by the [a]rchitect." In fact, the only expert that testified regarding the leaks stated that it would not be within the standard of care under the weekly inspection provision to keep track of each and every source of the leaks. *Id.*

In *Reid*, the Alabama Supreme Court held that the plaintiff did not present sufficient evidence of the professional standard of care and breach thereof. 350 So. 2d at 1027. The plaintiff's expert had testified that there were multiple possible solutions to the safety problem at issue. *Id.* Furthermore, the defendant's experts presented undisputed testimony that the solution recommended by the defendant would have met the standard of care existing at the time of the alleged breach had it been followed. *Id.* Thus, the testimony of the plaintiff's expert that one particular solution should have been recommended merely stated his own personal preference and was insufficient to establish a breach. *Id.*

Turning now to the evidence presented by Glenn Construction in support of its negligence claims, this Court is satisfied that the expert testimony of Ashley, a professional engineer at OSI, suffices to establish the requisite standard of care and breach thereof with respect to some of these claims. Additionally, the Court further finds that some of the standards of care and breaches thereof would be obvious, thus rendering expert testimony unnecessary.

### a. *Negligence as to the Original Foundation Designs*

First, regarding the designs for the foundation, Ashley opined that once a structural

47

engineer receives generic metal building loads, "[t]hey *must* apply engineering knowledge to verify, based on their opinion, that those reactions are correct." (Doc. # 69 Ex. 4, Ashley Dep. 18:8–14) (emphasis added). Ashley's testimony indicates that the ordinary standard of care imposed upon structural engineers when reviewing generic designs is to verify them and that the failure to do so is a breach of that standard. Ashley further testified that, in his opinion, there were engineering criteria known to BWSC when they issued the designs that were not reflected in those designs, that the anticipated loads were "grossly undersized," and that the difference between the anticipated loads and actual loads was "not within normal ranges of variation." (Doc. # 69 Ex. 4, Ashley Dep. 18:15–23, 31:15–20). In other words, this testimony sufficiently indicates that BWSC breached this standard of care by failing to verify the designs and/or incorporate known engineering criteria. Thus, Glenn Construction has presented sufficient evidence of a negligence claim for the allegedly inadequate foundation designs based upon the use of incorrect anticipated loads.[23] Thus, BWSC's motion for summary judgment, (Doc. # 49), is due to be DENIED with respect to this claim.

### b. Negligence Claims for the Revised Foundation Designs in

---

[23] This Court notes that, unlike *Reid*, this is not a case where there are multiple solutions to a problem such that the standard of care incorporates various options. Rather, there are only two possible answers regarding the standard of care: either the standard of care encompassed verifying the foundation designs or it did not. Ashley was *not* merely stating his preference for one particular option amongst many. Rather, Ashley testified that, in his expert opinion, a structural engineer *must* verify generic drawings and incorporate known features which might change them. Additionally, unlike *Watson* and *Collins*, this case does not involve the *complete* lack of expert testimony by the plaintiff regarding the standard of care and the breach thereof.

### *May of 2007*

With respect to the revised foundation designs of May of 2007, this Court agrees with Glenn Construction that the standard of care and alleged breach thereof at issue here does not require expert testimony.  *See e.g., Dews v. Mobile Infirmary Ass'n*, 659 So. 2d 61, 63 (Ala. 1995) (holding that there is an exception to the general rule requiring expert testimony in medical malpractice cases where "the lack of care is so apparent as to be within the ken of the average layman") (citations omitted); *see also Aetna Ins. Co. v. Hellmuth, Obata, & Kassabaum, Inc.*, 392 F.2d 472, 478 (8th Cir. 1968) (holding, under a similar requirement for expert testimony, that "there are certain duties patently required of the architect that are within the common knowledge and experience of laymen serving as jurors" and that expert testimony is "not necessary in passing on commonplace factual situations that the ordinary jury laymen can readily grasp and understand"); *Milton J. Womack, Inc. v. House of Representatives*, 509 So. 2d 62, 65–66 (La. Ct. App. 1987).

Here, the evidence establishes that BWSC was solely responsible for the foundation design and that the revised drawings provided to Glenn Construction were not done to scale such that the location of the reinforcement bars could be seen to fit properly. A reasonable jury could find that the revised foundation designs were impossible to do in the space provided, as Ashley testified, and that BWSC failed to exercise reasonable care when it provided Glenn Construction with these illustrative drawings.  *Cf. Milton*, 509 So. 2d at 67 (holding that an architect's failure "to take reasonable steps to determine the

location of structural elements" did not require expert testimony to establish the standard of care and breach thereof). However, the Court finds that there is insufficient evidence to establish that BWSC acted with reckless indifference when it issued the revised designs for the foundation in May of 2007. Thus, Glenn Construction has presented sufficient evidence of a negligence claim as to the revised foundation designs, and BWSC's motion for summary judgment, (Doc. # 49), is due to be DENIED as to this claim.

c.   *Negligence Claim from the Alleged Repeated Refusals to Correct the Problems With the Reinforcement Bars*

Furthermore, Ashley testified that it is generally the engineer's responsibility "to determine what to do when there is a conflict or congestion issue between the reinforcement bars and other material in a pedestal"—*i.e.* that this is the ordinary standard of care for engineers. (*Id.* 40:13–18). He further testified that it would be "not [be] reasonable for the structural engineer of record to not give further clarification" as to the placement of reinforcement bars in such a situation. (*Id.* 43:6–9). This indicates that it is a breach of the ordinary standard of care for the engineer of record to fail to provide clarification when there is a conflict or congestion with respect to the placement of those bars. Ashley further testified that, in such a situation, it would "absolutely incumbent" upon the structural engineer to issue dimension drawings showing the location or the steel or to remove steel. (*Id.* at 76:10–22). Thus, Glenn Construction has presented sufficient evidence of a negligence claim based upon BWSC's failure to provide instruction or

50

clarification as to the congestion or conflict with the reinforcement bars caused by the revised drawings issued in May of 2007.[24]  Thus, BWSC's motion for summary judgment, (Doc. # 49), is due to be denied as to this claim.

> ### d.  *Negligence Regarding the Posting of Obsolete Drawings*

Additionally, with respect to the posting of obsolete drawings on the website, this Court finds that it is obvious that the standard of care in this situation involves the exercise of ordinary care in posting the correct drawings and that the failure to do so would be an obvious breach of that duty.  Thus, Glenn Construction has presented sufficient evidence of a negligence claim regarding the posting of obsolete drawings. *Watson*, 559 So. 2d at 173 ("[I]n cases dealing with an alleged breach of a duty by . . . [a] professional, *unless the breach is so obvious that any reasonable person would see it*, then expert testimony is necessary to establish the alleged breach.") (emphasis added). Therefore, BWSC's motion for summary judgment, (Doc. # 49), is due to be DENIED as to this negligence claim.

> ### e.  *Negligent Supervision*

Similarly, this Court finds that the standard of care for Glenn Construction's negligent supervision claim does not require expert testimony.  *See Jaeger v. Henningson,*

---

[24]  Again, unlike *Reid*, Ashley is not merely stating his preference for one appropriate option over the other, but rather what the appropriate duties are for a structural engineer in such a situation—namely, to clarify and correct problems with the placement of reinforcement bar.  His testimony is also enough to distinguish this case from *Watson* and *Collins* where the plaintiffs failed to present any expert testimony whatsoever.

*Durham & Richardson, Inc.*, 714 F.2d 773, 776 (8th Cir. 1983) (finding a distinction between negligent supervision by an architect and negligence in preparing plans and holding that the former falls within the "common knowledge" exception to the rule requiring expert testimony); *see also Edwards v. Hyundai Motor Mfg. Ala., LLC*, 603 F. Supp. 2d 1336, 1357 (M.D. Ala. 2009) (Thompson, J.) (holding that a negligent supervision claim exists where (1) an employee committed an underlying tort, (2) the employer had actual notice or would have gained such notice if it had exercised reasonable care, and (3) the employer "*failed to respond . . . adequately*") (emphasis added).  Thus, BWSC's motion for summary judgment, (Doc. # 49), is due to be DENIED as to the negligent supervision claim.

### f.     *The Remaining Negligence Claims*

Finally, with respect to any remaining negligence claims, this Court finds that Glenn Construction has failed to provide sufficient evidence as to the standard of care and breach and that such standards of care and breach are not obvious.  For example, Glenn Construction's Complaint alleges claims for BWSC's alleged failures in performing timely inspections, issuing change orders, and recommending claims to Bell Aero.  (Doc. # 1, at 44 ¶¶ 217(h), (k), (p), (x)).  Such claims require expert testimony as to the ordinary standard of care in the industry regarding BWSC's duties as an engineer and alleged breach thereof.  However, none of the experts provided by Plaintiff address these issues.  In sum, BWSC's motion for summary judgment is due to be GRANTED with respect to

the remaining negligence claims.

### D.     The Wantonness Claims

Wantonness is defined under Alabama law as  "[c]onduct which is carried on with a reckless or conscious disregard of the rights or safety of others."  Ala. Code § 6-11-20(b)(3); *IMAC Energy, Inc. V. Tittle*, 590 So. 2d 163, 169 (Ala. 1991) ("[W]antonness is the doing of some act or the omission to do some act with reckless indifference that such act or omission will likely or probably result in injury."); *accord Blizzard v. Food Giant Supermarkets, Inc.*, 196 F. Supp. 2d 1202, 1208 (M.D. Ala. 2002) (Albritton, J.) (citations omitted).  Under Alabama law, wantonness is qualitatively different from negligence.  *See Tolbert v. Tolbert*, 903 So. 2d 103, 115 (Ala. 2004) ("Wantonness is not merely a higher degree of culpability than negligence.  Negligence and wantonness, plainly and simply, are qualitatively different tort concepts of actionable culpability.").  Indeed, Alabama law recognizes that "a jury may find a defendant wanton without finding the defendant negligent." *Sparks v. Ala. Power Co.*, 679 So. 2d 678, 682 (Ala. 1996).  BWSC's sole argument with respect to the wantonness claims is that Glenn Construction has failed to put forth expert evidence as to the professional standard of care.  However, all of the cases cited to by BWSC require expert testimony in professional *negligence* claims. Indeed, this Court cannot find any case applying the expert testimony requirement for negligence claims to wantonness claims.  Because wantonness is qualitatively different from negligence and because a jury may find wantonness without finding negligence,

53

BWSC has not proven that it is entitled to judgment as a matter of law—*i.e.* it has not

proven that Glenn Construction must establish a standard of care by expert testimony to

prevail on the wantonness claims.  Thus, summary judgment is due to be DENIED as to

the wantonness claims.

### E.   Glenn Construction's Motion to Supplement, (Doc. # 78), and BWSC's Motion to Strike that Motion to Supplement, (Doc. # 82)

 Glenn Construction's seeks to supplement its response with the internal drawings

referenced in the July 23, 2007 emails between BWSC employees as well as a second

affidavit from Wolfe discussing these internal drawings.  Glenn Construction contends

that the internal drawings "demonstrate, unequivocally, the exact inference Glenn

Construction argued their absence would have created, *i.e.*, that BWSC attempted to

prepare to-scale drawings but halted the process when it became obvious that they could

not fit all the specified steel into the pedestals as drawn and that BWSC suppressed this

information from, apparently, both Bell Aero and Glenn Construction."  (Doc. # 78, at 5).

BWSC opposes this motion to supplement and moves to strike it.  (Doc. # 82).  Bell Aero

has also joined in BWSC's opposition and motion to strike.  (Doc. # 84).

However, this Court has already determined that Glenn Construction failed to

properly plead a fraudulent suppression claim based on these internal drawings.  *See*

*infra*, at 27 n.15.  Furthermore, Glenn Construction provided other evidence—*i.e.*

Ashley's expert testimony, that the foundations were impossible to design according to

the May of 2007 revised drawings.  Finally, the legitimate inferences which Glenn

54

Construction states these drawings "unequivocally show" were already recognized and relied upon by this Court in considering the previously discussed fraud, negligence, and wantonness claims.  As such, the motion to supplement, (Doc. # 78), and the motion to strike that motion to supplement, (Doc. # 82), are due to be DENIED as MOOT.

## II.    Bell Aero's First Motion for Summary Judgment (Doc. # 32)

Bell Aero filed its first motion for summary judgment on November 9, 2010. (Doc. # 32).  The motion's factual basis stemmed from Bell Aero's requests for admissions, which Glenn Construction had not responded to in time.  Thus, Bell Aero argued that they were deemed admitted and, therefore, demonstrated that Glenn Construction failed to satisfy express conditions precedent to receipt of final payment. On November 12, 2010, Glenn Construction filed a motion to withdraw or amend the responses to these requests for admissions.  (Doc. # 37).  On November 30, 2010, Glenn Construction's motion was granted because Glenn Construction had not received the requests for admissions.  (Doc. # 43).  Thus, the requests for admission are no longer deemed admitted by operation of law, and Bell Aero's motion for summary judgment based upon those requests for admissions, (Doc. # 54), is due to be DENIED as MOOT.[25]

---

[25]  Bell Aero contends that this first summary judgment motion is still due to be granted "because in response [Glenn Construction] failed to satisfy the burden of submitting evidence necessary to create a genuine issue of material fact."  (Doc. # 55, at 14 n.2).  This argument is unconvincing.  Bell Aero bears the initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  The magistrate judge determined that Glenn Construction had never received the requests for permission and permitted Glenn Construction to respond to the requests.  Because of this decision, Bell Aero's arguments were insufficient to meet its *initial* burden on a motion for summary judgment.

III.    **Bell Aero's Alternative Motion for Summary Judgment (Doc. # 54)**

Bell Aero filed its alternative motion for summary judgment on January 14, 2011,

(Doc. # 54).  One main dispute with respect to Glenn Construction's claims against Bell

Aero is whether Bell Aero is responsible for BWSC's actions based on agency law or the

theory of respondeat superior.  Glenn Construction argues that Bell Aero is

responsible—in tort and on the breach-of-contract claims—for BWSC's actions based on

the theory that BWSC was Bell Aero's agent.  Bell Aero disagrees.  Before considering

the specific tort and breach-of-contract claims, this Court will first resolve the issue of the

relationship between Bell Aero and BWSC.

A.    **The Relationship between Bell Aero and BWSC**

The parties dispute whether Bell Aero's supposed liability for the actions of

BWSC stems from general agency principles or from the more specific principle of

respondeat superior.  Glenn Construction argues that it need only establish that BWSC is

Bell Aero's agent.  Bell Aero, on the other hand, contends that Glenn Construction must

satisfy the doctrine of respondeat superior.  Under either test, Glenn Construction bears

the burden of establishing the appropriate relationship.  *See Glass v. Southern Wrecker*

*Sales*, 990 F. Supp. 1344, 1352 (M.D. Ala. 1998) (Albritton, J.) (agency relationship)

(citing *Wood v. Shell Oil Co.*, 495 So. 2d 1034, 1035 (Ala. 1986)); *Ramsey v. Gamber*,

No. 3:09-cv-919, 2011 U.S. Dist. LEXIS 11893, at *6 (M.D. Ala. Feb. 7, 2011)

(Thompson, J.) (respondeat superior) (citing *Ala. Power Co. v. Key*, 224 Ala. 286, 287

56

(Ala. 1932)).  However, this Court need not decide which test applies because the two

tests are so similar and because there is no evidence on the record before this Court by

which a reasonable jury could find either a general agency relationship or  respondeat

superior liability.

> With respect to the existence of an agency relationship, this district has explained

that

> [u]nder Alabama law, the test of agency is the right of control, whether
> exercised or not.  *Brown v. Commercial Dispatch Publishing Co.*, 504 So. 2d
> 245 (Ala. 1987).  For one to be an agent, the other party must retain the right
> to direct the manner in which the business shall be done, as well as the results
> to be accomplished, or, in other words, not only what shall be done, but how
> it shall be done.  *Id.* at 246.  'Control must be proven; and proof of control
> requires more than proof of mere right to determine if the person claimed to
> be an agent is conforming to the requirements of a contract.'  *Malmberg v.
> American Honda Motor Company, Inc.*, 644 So. 2d 888 (Ala. 1994).

*Id.*[26]  Similarly, under the theory of respondeat superior, the plaintiff must "establish the

---

[26]  Where the principal actually has the right to control the agent, an actual agency relationship exists.  If a purported principal does not actually have the right to control but his conduct causes a third party to believe that it had the right to control the purported agent, then an apparent agency exists.  *See Bengston v. Bazemore*, No. 3:06-vc-569-MEF, 2007 U.S. Dist. LEXIS 84199, at *15–16 (M.D. Ala. 2007) (Fuller, C.J.) ("[B]ecause of the conduct of the principal, the third party must believe that there is a principal-agent relationship under which the principal has the right to control the agent.").

Here, Glenn Construction only argues that there was an actual agency relationship between Bell Aero and BWSC.  (Doc. # 66, at 40 ("[U]nder agency principles, 'an express agency is an *actual agency* created as a result of the oral or written agreement of the parties, and an implied agency is also an *actual agency*, the existence of which as a fact is proved by deductions or inferences form the other facts and circumstances of the particular case, including the words and conduct of the parties.'") (emphasis added) (quoting *Fisher v. Comer Plantation, Inc.*, 772 So. 2d 445, 465 (Ala. 2000)).  However, even if Glenn Construction hard argued apparent authority, this Court finds that there is no evidence on the record that Bell Aero ever acted as if it had the right to control BWSC's performance.

status of employer and employee—master and servant—and establish that the act was done within the scope of the employee's employment." *Chamlee v. Johnson-Rast & Hays*, 579 So. 2d 580, 582 (Ala. 1990) (citations omitted).  In the establishment of the first prong—*i.e.* the existence of an employer-employee or master-servant relationship—control by the purported employer is again the key.  *Tyson Foods, Inc. v. Stevens*, 783 So. 2d 804, 808 (Ala. 2000) ("Whether a relationship is an independent contractor relationship or is a master-servant relationship depends on whether the entity for whom the work is performed has reserved the right to control the means by which the work is done.").

Here, Glenn Construction relies heavily upon the Alabama Supreme Court case of *Berkel & Company Contractors, Inc. v. Providence Hospital*, 454 So. 2d 496 (Ala. 1984). (Doc. # 66, at 40, 55).  In *Berkel,* a subcontractor of the general contractor sued the owner and architect for claims arising out of a construction project.  *Id.* at 498.  In a footnote, the *Berkel* court discussed the issue of whether the architect was an agent of the owner:

> Under the traditional owner-architect-general contractor arrangement, Alabama law recognizes 'the well established proposition that an architect is the agent for the owner and the owner is responsible for any damages caused by the architect's deficiencies [in supervision and coordination] insofar as the other parties are affected thereby.'

454 So. 2d at 502 n.3.

Whatever may be the "traditional" owner-architect-general contractor relationship referred to in *Berkel*, the Alabama Supreme Court subsequently made clear in *Collins*

*Company v. Decatur* that the issue of agency between the engineer and the owner on a

construction project is one that must be based "upon the peculiar facts" of each case. 533

So. 2d 1127, 1132 (1988). Indeed, in *Collins*, the owner had "entered into a contract by

which [the engineer] was to provide general engineering supervision, to draw plans and

specifications, to prepare the project bid and construction documents, and to assist [the

owner] in awarding the construction contract." *Id.* Under this agreement, the owner only

"retained authority to change construction specifications." *Id.* Thus, the Alabama

Supreme Court specifically found that the engineer was not the owner's agent, but rather

an independent contractor, because the owner "gave [the engineer] full authority to

supervise, manage, and inspect the construction" and only "retained . . . the right to sign

orders that materially changed construction specifications." *Id.* at 1132. As the *Collins*

case illustrates, the issue of agency is a peculiar to the facts of each case and does not

automatically occur simply because of an owner-engineer-general contractor relationship.

*Id.* Such a finding comports with general Alabama agency law which holds that "[w]hen

a defendant's liability is to be based on agency, *agency may not be presumed*; . . . the

party asserting agency has the burden of presenting [sufficient] evidence of the alleged

agency. *see also John Deere*, 883 So. 2d at 178 (emphasis added).

   Glenn Construction also points to several portions of the Contract as evidence of

the existence of an agency relationship between Bell Aero and BWSC. Glenn

Construction initially points to the fact that the Contract describes BWSC as Bell Aero's

"representative" on the Project during construction.  (Doc. # 57 Ex. 1, General Conditions § 9.01).  However, under Alabama law, "agency is to be determined by the facts and not by how the parties characterize the relationship."  *Anglin v. Household Retail Servs.*, 17 F. Supp. 2d 1251, 1255 (M.D. Ala. 1998) (Albritton, J.) (noting also that the "key . . . is that there must be an indicia of control").  Glenn Construction further points to the following specific duties of BWSC while acting as Bell Aero's "representative" under the Contract:

> (1) communicating on behalf of Bell Aero ([*Id.*] § 8.01); (2) making site visits at "intervals appropriate" ([*Id.*] § 9.02(A)); (3) issuing reasonably prompt clarifications and interpretations that are binding on Bell Aero and Glenn Construction (*Id.* § 9.04); (4) authorizing minor variations in work via Field O[r]der to be binding upon Bell Aero (*Id.* § 9.05); rendering impartial decisions as interpreter and judge of a claim (*Id.* § 9.09(B)); reviewing the application for final payment to 'determine generally' that the content of the application complies with the Contract; (6) recommend[ing] change orders (§ 10.03(A)); (7) rendering decisions on claims for adjustment in price [and time] . . . (§ 10.05(A) & (B)); and reviewing applications for payment (§ 14.02).

(Doc. # 66, at 39).  Regarding the fact that Bell Aero was to communicate to Glenn Construction through BWSC under § 8.01 of the Contract, merely acting as an intermediary between two parties is insufficient to establish an agency or master-servant relationship with either party.  *See Glass*, 990 F. Supp. at 1352–53 (holding that an intermediary between the buyer and seller of a vehicle was not an agent of the seller where there was "no evidence from which to draw a conclusion that [the seller] had the right to control the manner in which [the intermediary] conducted business") (citing *Matsumura v. Eilert*, 74 Wash. 2d 362, 444 (Wash. 1968) (no agency relationship found between intermediary and seller where intermediary not acting under control of seller)).

60

Furthermore there is absolutely no evidence before this Court which demonstrates that Bell Aero had any control over *when* and *how* BWSC went about its duties as the engineer on the Project—whether it be issuing field orders or rendering decisions on claims. The Contract gave BWSC independent responsibilities over which neither party had control. For example, BWSC was to make site visits whenever it deemed them to be necessary. (Doc. # 57 Ex. 1, General Conditions § 9.02(A)). Similarly, BWSC was to issue clarifications or interpretations of the Contract as it deemed them to be necessary. Bell Aero had no right to control when or how BWSC made such site visits or issued such clarifications. (*Id.* § 9.04). BWSC also had the power to independently authorize minor variations in the Project and to independently make decisions as to recommending change orders. (*Id.* §§ 9.05, 10.03). Finally, BWSC was to act as an impartial decisionmaker with respect to claims—*i.e.* neither Bell Aero nor Glenn Construction had the right to control how BWSC decided the claim at issue. (*Id.* § 9.09(B)). Indeed, BWSC's actions regarding clarifications in the Contract, authorizations of minor variations, recommendations of change orders, and decisions on claims were to be binding on *both* parties.

In sum, neither Glenn Construction nor Bell Aero had the right to control how BWSC performed its engineering responsibilities. Indeed, this Court finds the instant action to be analogous to *Collins* whereby an engineer was deemed not to be the agent of the owner when the owner "gave [the engineer] full authority to supervise, manage, and

inspect the construction."  533 So. 2d at 1132; *see also Fisher v. Comer Plantation, Inc.*,

772 So. 2d 445, 464 (Ala. 2000) (holding that a real estate appraiser was acting as an

independent contractor when it made its appraisal because neither the property owner nor

the real-estate brokerage firm "retained the right to direct the manner in which [the

appraiser] prepared the appraisal").  As there is no evidence before this Court that Bell

Aero had the right to control BWSC on the Project, this Court holds that BWSC was not

Bell Aero's agent or servant.

**B.     The Tort Claims Based Upon Bell Aero's Independent Actions**

**i.     Fraud, Intentional Interference with Contractual Relations, and Wantonness**

Bell Aero argues, and this Court agrees, that Glenn Construction's Complaint

failed to allege sufficient facts to provide notice of any independent tort claims against

Bell Aero for fraud, intentional interference with contractual relations, and wantonness.

As a plaintiff may not raise new claims on summary judgment, *see Gilmour*, 382 F.3d at

1314, Bell Aero's alternative motion for summary judgment, (Doc. # 54), is due to be

granted as to these claims.  Additionally, even assuming that such claims were

sufficiently plead in the Complaint, there is no evidence on the record sufficient to

establish prima facie cases for fraud, intentional interference with contractual relations,

and wantonness against Bell Aero based solely upon Bell Aero's own actions.  For this

additional reason, Bell Aero's alternative motion for summary judgment, (Doc. # 54), is

due to be GRANTED as to these claims.

### ii.     Negligence

In its response, Glenn Construction contends that it has alleged independent

negligence claims against Bell Aero—namely, that Bell Aero "fail[ed] to reign [sic] in

[its] architect and exercise some modicum of control over the Project and the subsequent

claims process" and that "Bell Aero negligently relied on BWSC's determination of

Glenn Construction's claims when BWSC was inherently conflicted during this process

(i.e. Glenn Construction's claims required BWSC to admit wrongdoing)."  (Doc. # 66, at

55).  Bell Aero makes several arguments applicable to this claim: (1) that Glenn

Construction did not plead negligence against Bell Aero; (2) that Bell Aero abandoned

these claims; and (3) that these claims can only be brought as breach-of-contract

claims—i.e. that they are *ex contractu*.[27]

---

[27]  Bell Aero's final contention is that Glenn Construction cannot avoid a bar to
contractual recovery by seeking the same damages in tort.  (Doc. # 66, at 20 (citing *Bruce v.
Cole*, 854 So. 2d 47, 58 (Ala. 2003); *Holman v. Childersburg Bancorp., Inc.*, 852 So. 2d 691,
699–02 (Ala. 2002); *Ex parte Bad Toys Holdings, Inc.*, 958 So. 2d 852, 859 (Ala. 2006); *Smith v.
Smith*, 466 So. 2d 922, 924 (Ala. 1985); *White v. Miller*, 718 So. 2d 88, 90 (Ala. 1998); *Hurst v.
Cook*, 981 So. 2d 1143, 1155-56 (Ala. Civ. App. 2007)).  However, none of these cases are
applicable here.
        *Smith* did not even involve tort claims, but rather a contract claim for specific
performance of an oral promise that was barred by the Statute of Frauds. 466 So. 2d at 924.
Similarly, *Bruce*, *Holman*, and *Hurst* concerned situations where the plaintiff sought to bring tort
claims based upon oral agreements that were barred by the Statute of Frauds.  *Bruce*, 854 So. 2d
at 57–58; *Holman*, 852 So. 2d 699–700; *Hurst*, 981 So. 2d at 1155–56.  Here, there is no dispute
as to the existence of the Contract, which is not barred by the Statute of Frauds. In *Bad Toys*,
unlike here, the plaintiff could not bring tort claims because they were actually for nonfeasance
under a contract—*i.e.* it was a contractual claim that could not be brought in tort.  958 So. 2d at
859.  Finally, in *White*, the plaintiff was an unlicensed subcontractor who sought to recover in
tort for the work and labor done under a contract that was void.  *White*, 718 So. 2d at 90.  Here,
although it is undisputed that Glenn Construction employed unlicensed subcontractors, the Court
finds that this does not render the Contract with Bell Aero void or unenforceable.  *See Med Plus*

### a.    *Negligence Claims in the Complaint*

Bell Aero initially contends that the Complaint does not state any negligence

claims against it.  This Court disagrees.  Count 1 is specifically brought against both

Defendants and alleges negligence claims as well as wantonness and breach-of-contract

claims.  Futhermore, this Court is satisfied that it has sufficiently pled these negligence

claims.  (*See* Doc. # 1, at 43 ¶ 217(g) (stating that Defendants are liable for "[r]equiring

Glenn Construction to process claims for defective plans and poor supervision of BWSC

through BWSC, an entity not a disinterested party in the dispute thereby delaying

resolution of the claims of Glenn Construction"), 46 ¶ 217(q) (stating that Defendants are

liable for "[f]ailing to supervise and/or control employees of BWSC so as to cause or

allow such employees to wrongfully cause injury to Glenn Construction by the acts

described herein")).[28]

### b.    *Abandonment*

Bell Aero also claims that Glenn Construction abandoned whatever tort claims it

pled against Bell Aero during the course of this litigation.  Bell Aero points to its Motion

---

*Props. v. Colcock Cosntr. Grp.*, 628 So. 2d 370, 374–75 (Ala. 1993) (affirming a jury verdict for a licensed general contractor against the owner because, in part, the contract between the parties was enforceable where the licensed contractor worked with an unlicensed contractor because a reasonable jury could have found that there was no scheme to circumvent the licensing requirements).

[28] To the extent that Bell Aero objects to the Complaint as a shotgun pleading, (Doc. # 73, at 16 n.4), the Court notes that the appropriate remedy for that would have been for Bell Aero to move for a more definite statement under Rule 12(e) of the Federal Rules of Civil Procedure. *See Anderson v. Dist. Bd. of Trs. of Cent. Fla. Cmty. Coll.*, 77 F.3d 364, 366 (11th 1996).

to Dismiss whereby it moved for dismissal of the Complaint against it and addressed only three types of claims: (1) the breach-of-contract claims; (2) the claims for open account; and (3) the claims for work and labor done.  (Doc. # 7).  Similarly, Bell Aero points to its first summary judgment motion wherein it stated that the "sole remaining claim against Bell Aero is for breach of contract."  (Doc. # 32, at 1; Doc. # 33, at 2).  In its responses to both these motions, Glenn Construction addresses Bell Aero's arguments on the breach-of-contract claims and fails to assert that it has alleged tort claims against Bell Aero.

However, the cases cited to by Bell Aero are not factually analogous to the instant case.  For example, in *Crayton v. Valued Services of Alabama, LLC*, the plaintiff was deemed to have abandoned particular claims pled in the Complaint where her response to summary judgment "fail[ed] to address [the] many arguments with respect to the perceived infirmities" in those claims.  737 F. Supp. 2d 1320, 1331 (M.D. Ala. 2010) (Capel, M.J.).  Here, the earlier motions to dismiss and motion for summary judgment made no arguments whatsoever to which Glenn Construction could respond.  Here, Bell Aero asks this Court to hold properly-pled claims abandoned where the plaintiff fails to recognize a single sentence stating those claims do not exist or fails to notice that the defendant seeks dismissal of the *whole* complaint against it and only argues the breach-of-contract claim.  This Court finds such an argument to be unpersuasive.  *Cf. In re Worldwide Web Sys., Inc.*, 328 F.3d 1291, 1295 (11th Cir. 2003) (considering a motion to set aside a default judgment and stating that there "is a strong policy for determining

65

cases on their merits"); 5 Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal

Practice and Procedure § 1471 (2d ed. 1990) (stating that one of the central purposes of

the Federal Rules of Civil Procedure "is to provide maximum opportunity for each claim

to be decided on its merits rather than on procedural technicalities").[29]  Thus, Bell Aero is

not entitled to summary judgment on these grounds.

### c.    *Ex Contractu*

Under Alabama law, there is a distinction between nonfeasance and misfeasance in

the performance of a contract.  Nonfeasance—*i.e.* the failure to do what one has promised

to do—carries no tort liability absent a duty to act apart from the promise made; however,

misfeasance or negligent affirmative conduct in the performance of a promise can subject

an actor to both tort and contract liability.  *Morgan v. S. Cent. Bell Tel. Co.*, 466 So. 2d

107, 114 (Ala. 1985). (citing *C & C Prods. Inc. v. Premier Indus. Corp.*, 290 Ala. 179,

186 (Ala. 1972); *Garig v. E. End Mem'l Hosp.*, 279 Ala. 118 (Ala. 1966)).  As the

Alabama Supreme Court in *Ex Parte Certain Underwriters at Lloyd's of London*

> [I]f there is [a] failure or refusal to perform a promise the action is in contract;
> if there is a negligent performance of a contractual duty or the negligent breach
> of a duty implied by law, such duty not being expressed in the contract, but
> arising by implication of law form the relation of the parties created by the

---

[29]  Bell Aero also points to Glenn Construction's motion seeking permission to amend its
responses to requests for admissions.  (Doc. # 37).  Glenn Construction had failed to respond to
these admissions and they were deemed admitted by operation of law.  In seeking to amend them,
Glenn Construction stated that "[t]he merits of [its] breach of contract action would be served by
allowing it to amend/withdraw these supposed admissions . . . ."  (*Id.* at 5).  Glenn Construction's
use of the phrase "breach of contract action" is not dispositive because, again, Bell Aero had only
argued the breach of contract claim.

> contract, the action may be either in contract or [in] tort.  In the latter instance,
> whether the action declared is in tort or [in] contract must be determined from
> the gist or gravamen of the complaint.

815 So. 2d 558, 563 (Ala. 2001);[30] *see also Morgan*, 466 So. 2d at 114 (stating that "there

will be liability in tort whenever misperformance involves a foreseeable, unreasonable

risk of harm to the interests of the plaintiff or where there would be liability for

performance without the contract" and finding tort liability  although "the relationship

between plaintiffs and defendants was primarily a contractual one").

Here, nothing in the Contract imposes upon Bell Aero the duty to control BWSC

or to exercise independent judgment as to the claims process.  The Court notes that this

finding may appear to conflict with its earlier holding that Bell Aero had no *right* to

control BWSC's performance of its duties under the Contract.  However, even though

Bell Aero had no right to control BWSC's *performance* of its engineering duties for

agency or respondeat superior purposes, it may be that Bell Aero had a duty to Glenn

Construction to remove BWSC as the engineer if BWSC could no longer act impartially.

---

[30] The Alabama Supreme Court has explained this difference by the following analogy:

> For instance, if the declaration allege the hiring of a horse to ride a certain place, and
> that the defendant rode him so immoderately that he died, this would be [tort]; for the
> contract of hiring imposed upon him the [independent] duty to ride in reason, or not
> unreasonably fast; but if the declaration alleged the hiring, and that he promised to
> ride with reasonable speed, but not regarding his promise he rode the horse
> immoderately, whereby he died, the action may be considered [contract].

*Wilkinson v. Mosely*, 18 Ala. 288 (1850); *see also Garig v. E. End Mem'l Hosp.*, 279 Ala. 118
(Ala. 1966).

Furthermore, Bell Aero made the argument regarding lack of right to control BWSC's performance solely in regards to whether an agency or master-servant relationship existed between the parties for purposes of holding Bell Aero responsible for BWSC's actions. Whether Bell Aero had an independent non-contractual duty to Glenn Construction is a separate issue that Glenn Construction will need to establish at trial. *See Morgan*, 466 So. 2d at 114 (noting that the three primary considerations are "(1) the nature of the defendant's activity; (2) the relationship between the parties; and (3) the type of injury or harm threatened"). There is no burden upon a district court to distill every potential argument that could be made based upon the materials before it on summary judgment; the onus is in the parties to formulate arguments. *See, e.g.*, *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); *Blue Cross & Blue Shield of Ala. v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990); *Chase v. Kawasaki Motors Corp., U.S.A.*, 140 F. Supp. 2d 1280, 1286 (M.D. Ala. 2001) (Albritton, J.). As such, Glenn Construction may properly bring these claims in tort[31] and Bell Aero's motion for summary judgment, (Doc. # 54), is due to be DENIED as to these negligence claims.

## C.    The Breach of Contract Claim

---

[31] However, the Court notes that Glenn Construction will need to establish the existence of such duties at trial. *See Morgan*, 466 So. 2d at 114 (noting that the three primary considerations are "(1) the nature of the defendant's activity; (2) the relationship between the parties; and (3) the type of injury or harm threatened").

The remaining independent claim that Glenn Construction brings against Bell Aero is for breach of contract in failing to make final payment.  Under Alabama law, a plaintiff must establish four elements for a breach-of-contract claim: "(1) a valid contract binding the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages."  *Cook's Pest Control, Inc. v. Rebar*, 28 So. 3d 716, 728 (Ala. 2009) (citations omitted); *accord Claybrook v. Cent. United Life Ins. Co.*, 387 F. Supp. 2d 1199, 1204 (M.D. Ala. 2005) (Thompson, J.).  Bell Aero contends that Glenn Construction has failed to present sufficient evidence its own performance under the Contract and of Bell Aero's nonperformance

### i.    Glenn Construction's Alleged Performance

Bell Aero contends that Glenn Construction has not established its own performance under the Contract because it used unlicensed subcontractors, failed to satisfy express conditions precedent, and failed to abide by the mandatory dispute resolution procedures of the Contract.

### a.    Unlicensed Subcontractors

The parties do not dispute that two of Glenn Construction's subcontractors—Skipper Construction and Team Building Construction—were unlicensed and in violation of Alabama law.  *See* Alabama General Contractor's Practice Act ("AGCPA").  Ala. Code § 34-8-1, *et seq.*  Under the Contract, Glenn Construction was required to "comply with all Laws and Regulations applicable to the performance of

the Work." (Doc. # 57 Ex. 1, General Conditions § 6.09(A)).  Glenn Construction was

also "fully responsible . . . for all acts and omissions of the Subcontractors."  (*Id.* §

6.06(C)).  Because Glenn Construction's obligations under the contract were "absolute,"

(*id.* § 6.19(B)), Bell Aero contends that Glenn Construction breached the Contract by

employing unlicensed subcontractors and that this breach precludes Glenn Construction's

contract claims against Bell Aero.[32]

  However, this Court finds that there is a genuine issue of fact as to whether Glenn

Construction substantially performed its promise to comply with all laws and regulations.

First, Glenn Construction has presented evidence that Team Building "did little or no

work" on the Project as Glenn Construction was reviewing his credentials.  The AGCPA

only requires subcontractors to be licensed "prior to beginning work on the project."  Ala.

Code § 34-8-7(5).  Thus, if Team Building did no work on the Project, as can reasonably

be inferred from Glenn Construction's evidence, then there was no violation of the

---

  [32]  Bell Aero also argues that Glenn Construction had an affirmative obligation under the AGCPA to ensure that its subcontractors were licensed.  (Doc. # 73, at 31 (citing Ala. Code § 34-8-6(a)).  The Court is not convinced that this is the case.  Section 34-8-6(a) punishes, in pertinent part, "any person including an owner, architect, engineer, construction manager, or private awarding authority who considers a bid from anyone not properly licensed under this chapter." Ala. Code § 34-8-6(a).  Subsection (d) further absolves liability when the contractor submits his license number prior to bidding.  *Id.* § 34-8-6(d).  However, subcontractors are permitted to be unlicensed *during bidding* and only need be licensed "prior to beginning work on the project." *Id.* § 34-8-7(5).  Thus, § 34-8-6(a) appears to require owners to ensure that general contractors are licensed; however, it says nothing about whether general contractors must ensure that their subcontractors are licensed.  Bell Aero has not sufficiently argued that this provision applies to general contractors who contract with subcontractors.  Even if it did apply to this situation, there is a genuine issue of material fact as to whether Skipper Construction's provision of a false license number would absolve Glenn Construction of liability.

AGCPA.  Additionally, with respect to Skipper Construction, Glenn Construction

presented evidence of fraud on the part of Skipper Construction in its provision of a false

licensing number to Glenn Construction.  Whether Glenn Construction substantially

performed under these provisions of the contract is a question of fact for the jury.  *See*

*Bay City Constr. Co. v. Hays*, 624 So. 2d 1031, 1034 (Ala. 1993).[33]

> ### *b.*   *Express Conditions Precedent Independent of BWSC's Failure to Give a Recommendation*

Bell Aero also points to several express conditions precedent to final payment

which are independent of BWSC's failure to recommend final payment.  (Doc. # 55, at

16)  In particular, Bell Aero points out that Glenn Construction must provide (1) all

documentation called for by the Contract Documents, (*Id.* § 14.07(A)(2)(i)), (2) consent

of the surety to final payment, (*Id.* § 14.07(A)(2)(ii)), and (3) either lien waivers from the

subcontractors or an all-bills-paid affidavit from Glenn Construction.  (*Id.* §

---

[33]  Bell Aero argues that Glenn Construction breached the provision in the Contract requiring it to use its progress payments to pay subcontractors, vendors, suppliers, and materialmen.  (*See* Doc. # 57 Ex. 1, General Conditions § 14.02(A)(2).  It claims that the breach is evident from the fact that, when Glenn Construction sought final payment, it still owed its subcontractors approximately $365,000.  The Court finds this argument unconvincing.  Glenn Construction's contentions in this lawsuit is that it was required to perform extra work because of BWSC's tortious conduct.  Thus, a jury could find that Glenn Construction did not breach the Contract—*i.e.* that it used the progress payments to pay its subcontractors but that the payments were insufficient to cover all of the additional work required by BWSC's tortious conduct.

Alternatively, it may be that the amounts owed to these subcontractors were incurred after the last progress payment—*i.e.* that Glenn Construction had paid all debts up to the last progress payment and that these debts had accrued since then.  Bell Aero has not pointed to any evidence that establishes when the previous progress payment occurred, when these debts to the subcontractors accrued, or whether the progress payments were sufficient to cover the costs of the allegedly additional work.

14.07(A)(2)(iii), (3)).  This Court finds that there is a genuine issue of material fact as to whether Glenn Construction provided all of the required documents.  That two of Glenn Construction's subcontractors filed liens against Bell Aero and that one subcontractor made a claim against the surety suggests that these documents were not provided.  However, the mere fact that one files a lawsuit does not necessarily mean they have a valid claim—*i.e.* the subcontractors could sign lien waivers and *still* file suit, although they may not be actually entitled to prevail.  Furthermore, Wolfe testified in his deposition that Glenn Construction had obtained lied waivers from its subcontractors as well as consent of the surety and had provided all required documentation.  Finally, that Glenn Construction still owed money to some subcontractors is not dispositive of whether they signed lien waivers because one can sign a lien waiver when one would otherwise have a valid lien.  *See Marx Assocs., Ltd. v. Emigrant Sav. Bank*, 703 F.2d 1361, 1369 (11th Cir. 1983) ("Under Alabama law, waiver requires the intentional *relinquishment of a known right*.") (emphasis added).

As for the all-bills-paid affidavit, the Court notes that it is undisputed that Glenn Construction never provided such a document.  However, the Contract contains conflicting provisions of whether or not the all-bills-paid affidavit is required in addition to the lien waivers or as an alternative to the lien wavers.  (*Compare* Doc. # 57 Ex. 1, General Conditions § 14.07(A)(2)(iii), (3) (stating that they are alternative options) *with* Doc. # 57 Ex. 16, Specifications § 01700 (stating that both are required)).  Both the

72

General Conditions and the Specifications are part of the Contract Documents.  (Doc. #

57 Ex. 1, General Conditions § 1.01(12) (incorporating the Specifications into the

Contract)).  However, under Alabama law, where a contract contains two conflicting

provisions, courts are to abide by the first provision.  *See e.g.*, *Voyager Life Ins. Co. v.

Whitson*, 703 So. 2d 944, 949 (Ala. 1997).  Here, because the General Conditions

incorporate the Specifications at issue, the first provision is that contained in the General

Conditions—*i.e.* that an all-bills-paid affidavit is an alternative to the provision of lien

waivers.  Glenn Construction's failure to provide an all-bills-paid affidavit does not

preclude him from seeking final payment.[34]  Thus, Bell Aero has not proven that there is

no genuine dispute as to material fact or that it is entitled to judgment as a matter of law

due to Glenn Construction's alleged failure to fulfill express conditions precedent.

### ii.  Bell Aero's Alleged Nonperformance

Bell Aero contends that its nonperformance cannot be established because "the

only event which could trigger any obligation requiring Bell Aero to make any payment"

to Glenn Construction is a recommendation by BWSC.  (Doc. # 55, at 17).  Bell Aero

---

[34]  Bell Aero also points to § 14.07(A) of the General Conditions as requiring an all-bills-paid affidavit.  As previously discussed, § 14.07(A) requires Glenn Construction to abide by the provisions of for progress payments.  Section 14.02(2) requires Glenn Construction to provide an affidavit stating that "all previous progress payments received on account of the Work have been applied on account to discharge [Glenn Construction's] legitimate obligations associated with prior application payments."  (Doc. # 57 Ex. 1, General Conditions § 14.02(A)).  This does not require an all-bills-paid affidavit for the entirety of the work done, but rather an affidavit saying that all *prior* payments have gone towards the payment of Glenn Construction's obligations.  That Wolfe testified that he provided all necessary documentation is sufficient to create a genuine issue of material fact as to whether these affidavit was provided.

contends that its obligation to make final payment never arose for several reasons.  First, it argues that the condition precedent is not excused because Glenn Construction has failed to put forward evidence of the professional standard of care for engineers. Additionally, Bell Aero contends that Glenn Construction's failure to abide by the mandatory dispute resolution procedures in the Contract precludes a finding of bad faith or fraud on the part of BWSC and that the decision as to the claims is therefore binding under the Contract.

### a.    Expert Testimony as to the Professional Standards

As previously stated, the expert testimony requirement for professional standards of care has only been applied on professional *negligence* claims, as opposed the to allegations of bad faith or fraud with respect to BWSC's denial of Glenn Construction's claims and its refusal to certify final payment.  Thus, even without finding negligence, a reasonable jury could find that BWSC acted in bad faith or fraudulently in denying the claims and refusing to certify final payment.  *See Bd. of Water & Sewer Comm'rs v. Bill Harbert Constr. Co.*, 870 So. 2d 699, 708 (Ala. 2003) ("A report known by [an independent third-party referee] to be false, working substantial injury to a party relying thereon, is a fraud.").  Although Bell Aero is not liable for BWSC's actions under agency principles or respondeat superior, such a finding would still excuse the condition precedent of BWSC's recommendation.  *See Catanzano v. Jackson*, 73 So. 510, 512 (Ala. 1916) ("While the parties to a contract may stipulate that the estimates of the work done

74

and of the compensation to be paid therefor shall be made by a third party, who shall also have power and be charged with the duty to pass upon the character of the workmanship employed and upon the quality of the materials used, yet in this regard the action of such third party will be final and binding on the parties only *in the absence of fraud and bad faith*.") (emphasis added).  As such, Bell Aero has not established that it is entitled to judgment as a matter of law as to its argument that it had no obligation to perform because of the failure of the BWSC to issue a recommendation.

> **b.**      ***Failure to Abide by the Mandatory Dispute Resolution Procedures***

Bell Aero contends that Glenn Construction failed to abide by the dispute resolution procedures in the Contract in two ways.  First, it contends that Glenn Construction failure to provide sufficient supporting data for its claims precludes a finding of bad faith or fraud on the part of BWSC.  While it appears that the Contract requires specific documentation for an increase in the Contract price, it does not appear to require the same specificity with respect to an increase in Contract time.  *Compare* Doc. # 57 Ex. 1, General Conditions § 12.01(B)(3) (explaining that changes to the Contract price where the parties do not agree on a lump sum will be made based upon the cost of the work as determined under § 11.01) *and* 11.01(A)–(B) (stating the specific items that are included and excluded in the cost of the work) *with* § 12.02(B) (explaining that changes to the Contract time are determined according to § 12) *and* § 12.05 (stating that the contractor is entitled to "an amount equal to the time lost due to . . . delay" where the

delay is beyond the control of the owner and the contractor).  Thus, even if Glenn

Construction is not entitled to "an increase in the amount of any potential Final Payment,"

(Doc. # 73, at 3), Bell Aero has not shown that Glenn Construction failed to submit a

proper claim for a further increase in the Contract *time* such that its alleged final

completion of the Project would be within the Contract time.

Second, Bell Aero argues that Glenn Construction did not challenge BWSC's

decision regarding its claims for increases in price and time within the 60-day period

called for in the Contract.  Bell Aero contends that it is now "undisputed that the decision

was rendered and emailed to [Wolfe's] correct email address on January 12, 2009." (Doc.

# 73, at 34).  In support of this, Bell Aero relies upon the presumption of receipt and

argues that Glenn Construction is presumed to have received BWSC's decision on

January 12, 2009.  Alabama courts recognize "a rebuttable presumption exists that a

letter, mailed with postage prepaid and properly addressed was received in due course by

the addressee."  *Davis v. Ala. Dep't of Indus. Rel'ns*, 641 So. 2d 810, 812 (Ala. Civ. App.

1994).  Bell Aero seeks to extend this rebuttable presumption beyond stamped and

properly addressed letters to emails by relying upon an Eighth Circuit case.  (Doc. # 73, at

34 n.8 (citing *Am. Boat Co., Inc. v. Unknown Sunken Barge*, 418 F.3d 910, 914 (8th Cir.

2005)).  However, Bell Aero has presented no evidence that this is the rule of law in

Alabama courts.  Furthermore, even if the email is presumed received, the presumption

would be a rebuttable one.  *Davis*, 641 So. 2d at 812.  Under Alabama law, an alleged

recipient's testimony denying receipt of the letter can be sufficient to rebut the presumption.  *See Pittman v. Gattis*, 534 So. 2d 293, 195 (Ala. Civ. App. 1988); *see also Hartford Underwriters Ins. Co. v. Reed*, No. 107605, 2010 Ala. LEXIS 109, at *17 (Ala. June 25, 2010) ("The presumption could have been rebutted by [the alleged recipient's] denial that it received the cancellation notice.").[35]  Here, Wolfe testified that he never received the January 12, 2009 email and that he only learned of BWSC's decision denying its claim in early February of 2009.  Under Alabama law, such evidence is sufficient to create a genuine issue of material fact as to whether Glenn Construction received the decision on January 12, 2009 such that it cannot challenge BWSC's decision.  Thus, Bell Aero's alternative motion for summary judgment, (Doc. # 54), is due to be DENIED as to the breach-of-contract claims.

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED that

1.    Plaintiff's Motion to Supplement Evidentiary Submittal in Opposition to Motions for Summary Judgment of Defendants, (Doc. # 78), is DENIED as MOOT.

2.    Plaintiff's Motion to Strike Affidavits of Michael Cole and Michael Petrin, (Doc. # 80), is DENIED as MOOT.

---

[35]  Bell Aero relies upon the Eleventh Circuit case of *In re Farris*, 365 Fed. Appx. 198, 200 (11th Cir. 2010), for the proposition that "[t]he mere denial of receipt, without more, is insufficient to rebut the presumption."  (Doc. # 73, at 34 n.8).  However, *Farris* was applying Georgia law.  Alabama law is clear that, even when considering properly addressed and stamped letters, "[e]vidence denying receipt of the letter does not render the evidence of the mailing inadmissible.  Neither is it conclusive.  Whether it was so mailed and received becomes a jury question."  *Sullivan v. E. Health Sys., Inc.*, 953 So. 2d 355, 360 (Ala. 2006).

3.  BWSC's motion to strike the motion to supplement, (Doc. # 82), is DENIED as MOOT.

4.  BWSC's motion to strike Brittingham's affidavit, (Doc. # 75), is DENIED as MOOT.

5.  BWSC's motion for summary judgment, (Doc. # 49), is GRANTED in part and DENIED in part.

6.  Bell Aero's first motion for summary judgment, (Doc. # 32), is DENIED as MOOT.

7.  Bell Aero's alternative motion for summary judgment, (Doc. # 54), is GRANTED in part and DENIED in part.

DONE this the 19th day of May, 2011.

_____/s/ Mark E. Fuller_____
UNITED STATES DISTRICT JUDGE